In re SECURITIES LITIGATION
BMC SOFTWARE, INC.

No. H–00–0359.

United States District Court,
S.D. Texas,
Houston Division.

Oct. 1, 2001.

David E. Sharp, Roger B. Greenberg, Greenberg Peden et al., Thomas E. Bilek, Hoeffner Bilek & Eidman, John G. Emerson, Jr., The Emerson Firm, Houston, TX,

Karen L. Thomas, Jan M. Adler, Tricia L. McCormick, Milberg Weiss et al., San Diego, CA, Michael Braun, Stull Stull et al., Los Angeles, CA, for Dov Klein, BMC Software Plaintiff Group, Stuart Weisenfeld, Edmond Malouf, Mildred Fielden, Dowling Enterprises of Waycross Inc., Narciso Aggio, Todd Sherwin, Dean Francola, James P. Smith, Larry Frangiosa, Richard Platzer and Josephine Platzer.

Charles W. Schwartz, Vinson & Elkins, Houston, TX, Terry T. Johnson, Wilson Sonsini et al., Palo Alto, CA, for BMC Software Inc., Richard P. Gardner, Stephen B. Solcher, Roy J. Wilson, Kevin M. Weiss, Kevin M. Klausmeyer, Max P. Watson, Jr., William M. Austin, Wayne S. Morris, M. Brinkley Morse, Robert E. Beauchamp, Theodore W. Van Duyn, Garland B. Cupp, Lew Gray and Brinkley Morse.

## MEMORANDUM AND ORDER

HARMON, District Judge.

Pending before the Court in the above referenced, consolidated, putative class action brought on behalf of purchasers of BMC Software, Inc. stock between July 29, 1999 and July 5, 2000 ("the Class Period")[1] and alleging fraud in violation of the Securities Exchange Act of 1934 ("Exchange Act"), are two motions: (1) Defendants BMC Software, Inc. ("BMC"), Max P. Watson, Jr. ("Watson"),[2] William M. Austin ("Austin"),[3] Richard P. Gardner ("Gardner"),[4] Robert E. Beauchamp ("Beauchamp"),[5] M. Brinkley Morse ("Morse"),[6] Kevin M. Weiss ("Weiss"),[7] Roy J. Wilson ("Wilson"),[8] Wayne S. Mor-

---

1. Although a class has not yet been certified, for clarity and simplicity the Court refers to the relevant time period as the "Class Period."

2. Watson was President, Chief Executive Officer and Chairman of BMC. The Amended Consolidate Complaint asserts that during the Class Period he is alleged to have sold 350,-000 shares of his BMC stock (or approximately 13% of his total holdings, according to Plaintiffs; 10% according to Defendants based on public filings, Exs. C–10, 13–16) based on insider information and pocketed over $18.3 million in proceeds. It further charges him with being a "controlling" person under § 20(a) of the Securities Act of 1934.

3. Austin was Senior Vice President and Chief Financial Officer of BMC during the relevant time. He allegedly sold 68,000 shares of his BMC stock (31% according to Plaintiffs; 22% according to Defendants based on SEC filings, Exs. C–2, 13–16) during the Class Period based on insider information and received over $3.5 million in proceeds.

4. Gardner was Senior Vice President—Field Operations of BMC. He purportedly sold 190,-800 shares of his BMC stock (22%) during the Class Period based on inside information, making more that $11.3 million.

5. Beauchamp was Senior Vice President—Research and Development of BMC. During the Class Period, according to Plaintiffs' Consolidated Amended Complaint, he sold 85,852 shares of his BMC stock (53% according to Plaintiffs; 25% according to Defendants based on SEC filings, Exs. C–3, 13–16) based on insider information and pocketed over $4.7 million.

6. Morse was Senior Vice President—Corporate Development of BMC. He is said to have sold 230,000 shares of his BMC stock (40%) during the Class Period and received over $11.6 million in proceeds.

7. Weiss was Senior Vice President—Americas of BMC. During the Class Period he allegedly sold 36,000 shares of his BMC stock (27% according to Plaintiffs;; 32 % according to Defendants, Exs. C–11, 13–16) for over $2.2 million in proceeds.

8. Wilson, the Senior Vice President—Human Resources of BMC, purportedly sold 29,278 shares of BMC stock (81% according to Plaintiffs; 25% according to Defendants, Exs. C–11, 13–16) during the Class period for $1.7 million.

ris ("Morris"),[9] Theodore W. Van Duyn ("Van Duyn"),[10] Kevin M. Klausmeyer ("Klausmeyer"),[11] and Stephen B. Solcher's ("Solcher's")[12] motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6)[13] and 9[14] and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 78u–4 *et seq.*,[15] (instrument

9.  Morris was Vice President—Marketing of BMC and is reported to have sold 16,000 shares of his BMC stock (28%) during the Class Period for illegal insider-trading proceeds of $939,080.

10.  Van Duyn was Chief Technology Officer of BMC and sold 232,606 shares of his BMC stock (or 71% according to Plaintiffs; 40 % according to Defendants, Exs. C–9, 13–16) during the Class Period based on inside information for a recovery of $13.2 million, according to the Consolidated Amended Complaint.

11.  Klausmeyer was Vice President and Chief Accounting Officer for BMC at all relevant times. He purportedly sold 57,680 shares of his BMC stock (68% according to Plaintiffs; 99% according to Defendants, Exs. C–5, 13–16) during the Class Period for a total of over $3.4 million in illegal insider-trading proceeds. Defendants assert that the sale was not unusual because Gardner was expecting to leave the company and actually left in January 2000.

12.  Solcher was Vice President and Treasurer and allegedly sold 68,000 shares of his BMC stock (70% according to Plaintiffs; 75% according to Defendants, Exs. C–8, 13–16) during the Class Period pursuant to insider information for a gain of over $4.1 million.

13.  In reviewing the sufficiency of a complaint in response to a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), before any evidence has been submitted, the district court's task is limited. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support its claims. *Id.* The district court should consider all allegations in favor of the plaintiff and accept as true all well-pleaded facts in the complaint. *Lawal v. British Airways, PLC,* 812 F.Supp. 713, 716 (S.D.Tex. 1992). Dismissal is not appropriate "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle him to relief." *Conley v.*

*Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Nevertheless, conclusory allegations or legal conclusions masquerading as factual conclusions do not defeat a motion to dismiss. *Fernandez–Montes v. Allied Pilots Assoc.,* 987 F.2d 278, 284 (5th Cir.1993). Courts need only accept well-pleaded factual allegations as true. *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 520, 523 (5th Cir.1993); *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994)(courts should "not accept as true conclusory allegations or unwarranted deductions of fact.").

In the instant action, as discussed above and below, Plaintiffs must also satisfy the pleading requirements of Rule 9(b) (fraud must be pled with particularity) and for scienter under the PSLRA and Rule 10b–5.

14.  Rule 9(b) provides,

**Fraud, Mistake, Condition of Mind** In all averments of fraud, or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

In securities fraud actions, Rule 9(b) requires a plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Techs., Inc.,* 112 F.3d 175, 177 (5th Cir.) (*citing Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)), *cert. denied,* 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997).

The Fifth Circuit treats a dismissal for failure to plead fraud with particularity under Rule 9(b) as a dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *Lovelace v. Software Spectrum, Inc.,* 78 F.3d at 1017, *citing Shushany v. Allwaste, Inc.,* 992 F.2d at 520.

15.  The PSLRA amends the Securities Exchange Act of 1934 and applies to private class actions brought pursuant to the Federal Rules of Civil Procedure. Pub.L. No. 104–67, 109 Stat, 737, codified at 15 U.S.C. §§ 77k,

# 72); and (2) Lead Plaintiffs Associated Trust Company, Piedra Capital, Ltd., James Farris, Thomas Griffith for the Society of the Divine Word, and Kosair Charities' motion to strike exhibits pursuant to Federal Rule of Civil Procedure 12(f)(# 77).[16]

BMC is a public company headquartered in Houston, Texas selling high performance software tools and utilities for large companies' information technology systems, including mainframe, distributed, and internet-based systems. Its stock trades on the NASDAQ National Market System.

## Allegations of Plaintiffs' Consolidated Amended Complaint (# 50)

Plaintiffs sue under §§ 10(b) and 20(a)[17] of the Securities Act of 1934 and Rule 10b–5.[18] They charge that Defendants made

---

77l, 77z–1, 77z–2, 78a, 78j–1, 78t, 78u, 78u–4, 78u–5.

Under the PSLRA, 15 U.S.C. § 78u–4(b)(1) & (2),

(b) Requirements for securities fraud actions

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

If the facts are not pled with the requisite particularity, the action is to be dismissed. 15 U.S.C. § 78u–4(b)(3)(A). This provision thus requires a heightened standard of pleading over that set out in Federal Rule of Civil Procedure 9(b), which allows a state of mind, or scienter, to be averred generally. Dismissals for failure to plead fraud with particularity under Rule 9(b) or the PSLRA are treated as dismissals for failure to state a claim under

Fed.R.Civ.P. 12(b)(6). *Lovelace,* 78 F.3d at 1017.

To establish a claim for securities fraud under § 10 of the Exchange Act of 1934, a plaintiff must prove (1) a misstatement or omission (2) of a material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused the plaintiff's injury. *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996). Scienter is " 'a mental state embracing intent to deceive, manipulate, or defraud.' " *Id., quoting Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The plaintiff must establish scienter by showing that defendants acted with knowledge or severe recklessness in making misrepresentations. *Id.* at 1018 n. 2. To survive a Rule 9(b) motion to dismiss, a plaintiff must do more than conclusorily allege fraudulent intent; he must set forth specific facts sufficient to support an inference of fraudulent intent (scienter) by either (1) showing a defendant's motive to commit securities fraud or (2) identifying circumstances reflecting conscious behavior on the part of the defendant. *Lovelace,* 78 F.3d at 1018–19.

16. Rule 12(f) provides,

Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

Specifically Plaintiffs seek to strike Exhibits A–2 through A–16, A–18, A–19, A–21, A–23, A–24, A–26, A–27, A–29, A–30, C–1 through C–16, attached to the Appendix to the Memorandum in Support of Defendants' Motion to Dismiss.

**17.** Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (liability of controlling persons and those who aid and abet violations), establishes a derivative liability of persons who "control" those who are primarily liable under the Exchange Act. It provides,

> Joint and several liability; good faith defense
>
> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Controlling person liability is an alternate ground for liability from that of a primary violation. Thus a plaintiff may allege a primary § 10(b) violation by a person controlled by the defendant and culpable participation by the same defendant in the perpetration of the fraud. *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996). A person charged with control liability may assert a defense that he acted in good faith with respect to the securities violation, that he acted reasonably and did not act recklessly. A defendant can meet the requirements of a good faith defense by showing that he used reasonable care to prevent the securities violation. *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 960 (5th Cir.1981); *Donohoe v. Consolidated Operating & Prod. Corp.,* 30 F.3d 907, 912 (7th Cir.1994). Negligence alone is insufficient to support liability. *Carpenter v. Harris, Upham & Co.,* 594 F.2d 388, 394 (4th Cir.1979).

Although worded in different ways, the control person liability provisions of § 15 of the 1933 Securities Act and § 20(a) of the 1934 Exchange Act are interpreted the same way. *First Interstate Bank v. Pring,* 969 F.2d 891, 897 (10th Cir.1992), *rev'd on other grounds,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *Maher v. Durango Metals, Inc.,* 144 F.3d 1302, 1305 & n. 7 (10th Cir.1998). There is a split among the Circuits as to whether in a prima facie case a person must show that the alleged control person actually exercised control over the primary violator's general affairs or merely that the control person had the power to exercise such control. *Maher,* 144 F.3d at 1306 n. 8 (and cases cited and discussed therein). The Fifth Circuit has stated that a plaintiff need only show that the alleged control persons possessed "the power to control [the primary violator], not the exercise of the power to control." *Abbott v. Equity Group, Inc.,* 2 F.3d 613, 620 (5th Cir.1993).

In the Consolidated Amended Complaint, Watson is charged with being a controlling person under § 20(a) by virtue of his position as CEO and Chairman of BMC as well as his ownership of BMC stock. It further asserts that BMC controlled each of the individual Defendants and all of its employees and is also liable under the same provision.

**18.** Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, in relevant part makes it "unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ...":

> To use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Thus Section 10(b) bars conduct "involving manipulation or deception, manipulation being practices ... that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation or nondisclosure intended to deceive." *Field v. Trump,* 850 F.2d 938, 946–47 (2d Cir.1988).

To establish a federal securities fraud claim under § 10(b) of the Securities Exchange Act of 1934, a plaintiff must demonstrate (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused the plaintiff's injury. *Tuchman,* 14 F.3d at 1067.

Scienter, "a mental state embracing intent to deceive, manipulate, or defraud," is essential to the claim and must be adequately pleaded to survive a motion to dismiss. *Id., quoting Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Scienter may be proved by showing

Note 18—Continued

that the defendant acted with severe recklessness, which is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id., quoting Shushany,* 992 F.2d at 521.

To satisfy the second prong of materiality, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Basic, Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)(endorsing fact-intensive test of materiality in securities fraud cases). The Fifth Circuit has stated,

> "Materiality is not judged in the abstract, but in light of the surrounding circumstances." [*Krim v. BancTexas Group,* 989 F.2d 1435, 1448–49 (5th Cir.1993).] The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis "is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment." [*id.* at 1445] Inclusion of cautionary language—along with disclosure of any firm-specific adverse facts or assumptions—is, of course, relevant to the materiality inquiry, for such inclusion or disclosure is part of the "total mix of information." Nevertheless, cautionary language as such is not per se dispositive of this inquiry.

*Rubinstein v. Collins,* 20 F.3d 160, 167–68 (5th Cir.1994).

Rule 10b–5, 17 C.F.R. § 240.10b–5, entitled "Employment of manipulative and deceptive devices," provides,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> © To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Under the Exchange Act and Rule 10b–5, a plaintiff is given a private right of action "that reaches beyond the statements and omissions made in a registration statement or prospectus or in connection with an initial distribution of securities and creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory,* 114 F.3d 1410, 1417 (3d Cir.1997).

As noted, to establish a claim for federal securities fraud under § 10(b) and Rule 10b–5, plaintiffs must demonstrate (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiffs relied and (5) that proximately caused them injury. *Tuchman,* 14 F.3d at 1067. The requisite intent, or "scienter," for liability in a section 10(b) and Rule 10b–5 action is "an intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). "The words 'manipulative and deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional conduct." *Id.* Because not every misstatement or omission in a corporation's disclosures is actionable under the securities law, scienter is the key to determining what is. *Id.*

A defendant need not have made a false or misleading statement to be liable. Insider trading by a corporate insider based on material, nonpublic information, qualifies as a "deceptive device" under § 10(b) and violates the insider's duty to disclose or abstain from trading, and therefore constitutes a manipulative act. *United States v. O'Hagan,* 521 U.S. 642, 652, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (Trading on material, nonpublic information qualifies as a "deceptive device" under § 10(b) because "a relationship of trust and confidence exists between shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation" and that relationship "gives rise to a duty to disclose [or abstain from trading] because of the

the following false and misleading statements: (1) that BMC's existing software products were enjoying strong sales; (2) that following the acquisitions of Boole & Babbage and New Dimension Software earlier in 1999, integration was successful; (3) that there was strong demand for BMC's mainframe MIPS[19] software in spite of a slowdown in sales of IBM mainframe computers; and (4) that there was no significant lack of customer deferrals of orders or purchases due to Y2K concerns. These false and misleading statements allegedly artificially inflated the price of its stock to a Class Period high of $86–5/8 on January 3, 2000 and resulted in a 25%–30% growth for BMC during F00–F01[20] and the 3rd and 4th quarter F00 EPS of $.52—$.55 and $.58—$.64, respectively.

Furthermore, the Consolidated Amended Complaint alleges that during the Class Period, BMC insiders and controlling shareholders sold 1,364,215 shares of their BMC stock at as high as $78.83 to recoup $75.4 million in illegal insider trading proceeds. On January 5, 2000, two days after BMC's stock reached its highest price ever, BMC revealed that because of problems integrating BMC, Boole & Babbage and New Dimension sales forces, sales execution procedures in Europe and the United States, and weakness in demand for mainframe MIPS software products, its third quarter F00 results would be far worse than earlier predictions. That day BMC's stock plummeted from $85–1/8 to $47, an almost 50% drop. When BMC

reported a third quarter F00 EPS of just $.41—a decline from its second quarter F00 and its year-earlier third quarter F99 EPS—BMC stock continued to fall to $35.

Even after the disclosure on January 5, 2000, the amended complaint asserts, Defendants continued to issue false positive statements that BMC's troubles were behind it, to reassure analysts that BMC's mainframe business was "very strong" and "very profitable," and that its future was rosy. On January 25, 2000, Watson stated, "During the third quarter, the company faced an unusual set of challenges—some of which we believe were unique to this quarter and therefore behind us." BMC then surprised the market with a positive earnings report of $.49 per share for the quarter ending March 30, 2000, two cents above the street forecast. As a result, the stock went up to $46 per share and Defendants then sold off their own shares to add to their illegal insider trading proceeds.

According to the complaint, on July 5, 2000, the market was stunned when BMC announced that it would substantially miss earnings estimates. Its stock then plunged from $35 per share to $22, a loss of 40% that set a new 52–week low. Defendants blamed the loss on a shortfall in mainframe license revenues, in sharp contrast to their earlier optimism about that same area of BMC's business. When BMC announced its first quarter F01 results on July 25, 2000, it conceded that its mainframe products would decline 10–20%

'necessity of preventing a corporate insider from ... tak[ing] unfair advantage of ... uninformed ... stockholders.' "); *Shaw v. Digital Equipment,* 82 F.3d 1194, 1203 (1st Cir. 1996); *Dirks v. SEC,* 463 U.S. 646, 654, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983) (To satisfy the manipulation or deception requirement, an insider will only be liable under Rule 10b–5 when he fails to disclose material nonpublic information before trading on it and makes secret profits).

19. IBM's computer processing capacity is measured in millions of instructions per second, or "MIPS."

20. "F" or "FY" stands for fiscal year. As explained by Defendants' in their motion to dismiss at p. 6 n. 2, BMC's fiscal year 2000 began on April 2, 2000 and ended March 31, 2001. Thus the period between July 1–September 30, 1999 would be identified as 2ndQ F00.

further. The value of the stock then dropped below $20 per share, becoming the second worst performing stock for the year in the Standard & Poor's 500 Index.

Plaintiffs allege that each Defendant is liable for false statements and for failing to disclose adverse facts while selling BMC stock and for participating in a fraudulent scheme to deceive purchasers of BMC stock. To satisfy the PSLRA's requirement that Plaintiffs plead scienter, Lead Plaintiffs allege that the individual Defendants, by virtue of their executive positions in BMC and involvement in the day-to-day management of the business, actually knew from internal corporate documents and conversations with other corporate officers and employees, as well as attending management and Board meetings, the non-public, negative information about the condition of BMC's business. Specifically the amended complaint asserts that Defendants were aware of the limited demand for sales of its mainframe MIPS software products; of BMC's serious difficulties with integration of Boole & Babbage and New Dimension acquisitions, with BMC's sales force in Europe and the United States, and with customer deferrals and refusal to purchase because of Y2K concerns; and of BMC's deteriorating revenue and EPS prospects. Sales personnel purportedly informed individual Defendants about purchase and sales problems. Moreover Defendants allegedly knew there was no plan to integrate the various sales forces of the merging entities in Europe and the United States. Defendants also allegedly knew that the sales staff's turnovers were high and that the sales personnel were inexperienced, creating additional problems in generating valid sales. They also knew from regular communications with IBM that IBM was experiencing a slowdown in its mainframe/MIPS sales that would result in a slowdown in BMC's sales. Thus each Defendant actually knew

or recklessly disregarded that the public statements they made were false or misleading when they were made.

The Consolidated Amended Complaint also conclusorily asserts that all the Defendants had motive and opportunity to perpetrate the fraudulent scheme, as evidenced by their personally profiting from sales of their BMC stock after their false statements caused artificial inflation of the stock price. In mid to late July 1999, BMC stock fell from $64–7/8 to as low as $47–1/2 because investors feared that BMC's revenue and EPS growth would fail to meet forecast levels because of Y2K concerns, the slowing demand for BMC products, and difficulties integrating the Boole & Babbage and New Dimension acquisitions.

On July 29, 1999 BMC announced its first quarter F00 results, EPS of $42, much better than expected. Chairman, President and CEO Watson stated in BMC's release of the results,

> Our first quarter for fiscal 2000 was the one in which BMC Software completed its transition into a top-tier systems software provider. Following the merger with Boole & Babbage in March 1999, we successfully completed the acquisition of New Dimension Software. We have spent the quarter bringing the three companies together into what we believe is a powerful, integrated company.

On the same day, after the above, during a conference call for analysts, money and portfolio managers, institutional investors and large BMC shareholders to discuss the first quarter F00 results, its business and its prospects, Watson and Austin represented the following:

1. BMC was successfully integrating New Dimension and Boole and Babbage

into its operations and business was performing better than expected.

2. European sales were below plan due to slowness in integrating the Boole and Babbage merger, but operations there were now well integrated and would not interfere with BMC's achieving forecasted F00 results.

3. An increase in BMC's days sales outstanding ("DSO") to 86 was due to the acquisition of Boole & Babbage and New Dimension, which had higher DSOs than BMC; BMC's DSOs would retreat to its traditional 60s during the balance of F00.

4. BMC was experiencing continued strong demand for its mainframe MIPS software.

5. BMC expected that its operating margins would reach 34–36% by the end of F00.

6. BMC predicted third quarter F00 and fourth quarter F00 EPS of $.52–$.56 and $.58–$.64 by year end F00.

■ The amended complaint goes on to summarize numerous analysts' reports based on the conference call and subsequent conversations with Watson and/or Austin. Because the amended complaint specifically targets only alleged misrepresentations made by two officials of the company (Watson and Austin), because, as will be discussed, the complaint fails to state a private cause of action for insider trading under section 20A of the Exchange Act, and because those courts that have addressed the question of issuer liability for third-party misstatements (here analysts' reports) have established criteria for pleading and proof not met by the amended complaint here,[21] the Court summarizes

21. Generally a company has no liability for misleading claims made about it by an independent third party and no obligation to correct statements made by outsiders. However, a company may be liable for allegedly false and misleading statements in analysts' reports if it is sufficiently involved in preparation of those reports, as reflected in the "entanglement doctrine" initially developed by the Second Circuit Court of Appeals in *Elkind v. Liggett & Myers Inc.*, 635 F.2d 156, 163 (2d Cir.1980) (holding a company may be liable for an analyst's statement or forecast if it entangles itself to such an extent that the report can be attributed to it). The *Elkind* Court wrote, "We have no doubt that a company may so involve itself in the preparation of reports and projections by outsiders as to assume a duty to correct material errors in these projections. This may occur when officials of the company have, by their activity, made an implied representation that ... they have reviewed [the outsider's information and determined that it] is true or at least in accordance with the company's views." *Id.*

In *Raab v. General Physics Corp.*, 4 F.3d 286, 288 (4th Cir.1993), the Fourth Circuit concluded that a company cannot be liable for statements contained in an independent analyst's report absent proof that company exercised sufficient control over the report to attribute the report's statements to the company. It determined that General Physics did not exercise that kind of control over a Goldman Sachs report that would render it liable for the statements in the report. *Id.* at 289. The panel stated, "The securities laws require General Physics to speak truthfully to investors; they do not require the company to police statements made by third parties for inaccuracies, even if the third party attributes the statement to General Physics. Without control over Goldman Sachs' report, any statement made by General Physics personnel could be taken out of context, incorrectly quoted, or stripped of important qualifiers." *Id.* at 288. *See also Herman v. Legent Corp.*, 50 F.3d 6 (Table), No. 94–1445, 1995 WL 115879, *9–10 (4th Cir. Mar. 20, 1995).

In *In re Boston Tech., Inc.*, 8 F.Supp.2d 43, 55 (D.Mass.1998), the district court in discussing several appellate opinions, concluded that most courts generally require for an issuer to be found liable under § 10(b) or failure to correct an analyst statement that (1) the issuer "entangled" itself in the making of the statement by the analyst, (2) that the issuer knew that the statement or prediction was false or lacked a reasonable factual basis when made, and (3) the issuer failed to disclose the falsity or unreasonableness to inves-

the amended complaint's allegations about these reports in a footnote.[22]

tors. These courts also require that the pleadings satisfy Rule 9(b). *Fitzer v. Security Dynamics Technologies, Inc.*, 119 F.Supp.2d 12, 37 (D.Mass.2000).

Although the First Circuit has not yet ruled on whether a company may be held liable for statements made in analysts' reports, applying Rule 9(b) and "[a]ssuming arguendo that a company may be held liable for false or misleading statements in an analyst's report where the company has adopted, endorsed, or sufficiently entangled itself with the analyst's reports," the First Circuit has indicated that the following pleaded conduct is not sufficient to establish a *prima facie* case of liability:

> [I]t was the Company's practice to have top managers, namely, Chief Financial Officer Heilman, communicate regularly with securities analysts ... to discuss, among other things, the Company's earnings prospects, its products, the efficiency of the Company's manufacturing plants, anticipated financial performance, and to provide detailed "guidance" to these analysts with respect to the Company's business, including projected revenues, earnings, and of particular importance to analysts, earnings per share.

*Suna v. Bailey Corp.*, 107 F.3d 64, 73 (1st Cir.1997).

*But see Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir.1997) ("corporate defendants may be directly liable for [intentionally] providing false or misleading information to third-party securities analysts" and using them as conduits "to disseminate false information to the investing public").

This Court agrees with the majority view that there must be alleged facts showing some involvement in and control over the content of the analysts' reports by the defendants to hold them liable for misleading statements made in those reports.

**22.** On July 30, 1999, CIBC World Markets issued a report on BMC, authored by Melissa Eisenstat and based on information provided in the July 29, 1999 conference call and in follow-up conversations with Watson or Austin. That report increased the forecast F00 and F01 EPS to $1.98 and $2.47, and estimated the following quarterly F00 EPS for BMC: Q1—$.42; Q2—$.40; Q3—$.53; Q4—$.63; and Year—$1.98. The report further stated,

> BMC blew away 1Q00 ....

> These results allay much of our concern about execution risk as the company melded New Dimension and Boole and Babbage into its fold, and still posted strong top and bottom line results.
> We are raising our EPS for FY00 and FY01 to $1.98 and $2.47 ....
> We were somewhat surprised that international fared as poorly as it did given Boole's strength in Europe. Management noted that the Boole transaction in Europe was looked upon as a merger of equals, resulting in some turf wars in the region and therefore negatively impacting results. Management noted that the integration of its acquisitions abroad was behind that in the U.S. and that for the fiscal year, there is no change in the outlook.
> The balance sheet remains solid ....
> DSO trended up slightly to 86 days from last quarter's 84 days. At 86 days DSO is above the BMC's traditional range in the mid- to low-60s. The higher DSO is the result of the receivables from Boole and ND, both of which averaged DSO in excess of 100 days. Management noted on the call that it expects to bring DSO back to its traditional range by the end of this fiscal year.
> The Outlook
> BMC is firing on all cylinders. Its high-margin mainframe business continues to grow at rates which one company insider characterized to us as "surprising." ...
> We believe this quarter's strong results indicate that the acquisitions it made over the last year are coming together. More than simply adjusting parts of the organization, the cross selling opportunities between its products are bearing fruit.

On July 30, 1999, Warburg Dillon Read issued a report by Moody on BMC based on information provided in the July 29, 1999 conference call and in follow-up conversations with Watson and Austin. The report predicted F00 and F01 EPS of $1.99 and $2.53, a 25% five-year EPS growth rate, and the following quarterly F00 and F01 EPS for BMC: Q1—F00 $.42, F01 $.54; Q2—F00 $.43, F01 $.55; Q3—F00 $.55, F01 $.70; Q4—F00 $.58, F01 $.74; Year—F00 $1.99, F01 $2.53. A section entitled "SUMMARY" stated,

> Large deals and tightened integration of recent acquisitions (Boole and Babbage and

Note 22—Continued

New Dimension) (ND Software) characterized a strong fiscal Q1–00 earnings report by BMC Software ... well above management's previous 35% guidance, while earnings exceeded consensus by $0.02 to reach $0.42 versus $0.32 in the year ago quarter. DSOs were up by 3 days to 87 days, reflecting the 125+ day DSO of ND, which closed during Q1. We expect DSOs to trend down in future quarters. The balanced (and we believe sustainable due to the growth of e-commerce) strength of BMC's mainframe and client server business has prompted us to raise both revenues and EPS for fiscal 2000 and 2001.

On July 30, 1999, Bear Stearn's issued a report on BMC by Scocozza based on information provided by the conference call on 7/29/99 and follow-up conversations with Watson or Austin. It forecast for BMC F00 and F01 EPS of $2.00 and $2.50 and the following quarterly F00 and F01 EPS:

|       | F00    | F01    |
|-------|--------|--------|
| Q1    | $ .42  | $ .59  |
| Q2    | $ .43  | $ .60  |
| Q3    | $ .53  | $ .64  |
| Q4    | $ .63  | $ .68  |
| Year  | $2.00  | $2.50  |

The report approved of BMC's good market fundamentals, and noted that its management had indicated that the market is healthy and that growth in MIPs, which fuels BMC's mainframe revenues, may even be accelerating. It also positively reacted to the smooth integration of Boole & Babbage and New Dimensions in North America, where revenue had increased 63% year over year. These acquisitions, which directly increased BMC's "strength in enterprise systems management," "in our view solidify the company as a major force in the market."

Deutsche Bank Alex. Brown issued a report on the company by Mortenson on July 30, 1999, also based on the 7/29/99 conference call and follow-up conversations with Watson or Austin. It forecast F00 and F01 EPS of $2.00 and $2.50, respectively, and a 26% three-year growth rate, as well as the following quarterly F00 EPS for BMC: Q1 $.42 A; Q2 $.43; Q3 $.56; Q4 $.59. That report further stated,

After the close on 7/29, BMC reported very strong results for its F1Q (June) that by most metrics met or exceeded all our expectations and, we believe, those of the rest of the Street. With Boole and Babbage acquired on 3/30/99, BMC faced a lot of operational challenges in the quarter and, in our opinion, met them successfully. While

there are a few nits in the results that can be picked on—Europe and New Dimension revenues were below plan and deferred revenue did not grow sequentially—we view the overall results as positive. Moreover, we believe that they support our view that BMC is successfully transitioning itself from a very successful but niche software company to a strategic enterprise software vendor.

Likewise, on July 30, 1999, based on the same information, Josephthal & Company issued a report by Hochfeld, predicting F00 and F01 EPS of $2.05 and $2.50, forecast the following quarterly F00 EPS for the company: Q1 $.42 A; Q2 $.44; Q3 $.54; Q4 $.64. It commented that it believe recent concerns about the company were "overdone," and that none of them signaled "a negative change in the fundamental outlook of BMC." It addressed the following:

Concern # 1: "BMC needed a very large deal to make the quarter."

Response: BMC recognized more than $40 million from a very large deal in the quarter. This accounted for more than 10% of total revenues. Some investors may postulate that had BMC not signed this uncharacteristically large deal, it wouldn't have made its quarter. This is unrealistic, in our view. BMC has been somewhat reliant on large deals for years now ....

Concern # 2: "DSOs were relatively high."

Response: In the past six months, BMC has merged with both Boole and Babbage and New Dimension. These companies each had a historical DSO range of well over 100 days. Therefore the blended range of DSOs is bound to be higher. BMC expects the blended DSO to decrease gradually over the next few years as customers become accustomed to the BMC way of doing business. On a comparable basis, DSOs of 87 days are well within the pro forma blended range.

Concern # 3: "Deferred license revenues declined in the quarter."

Response: Total deferred revenues as reported on the balance sheet increased from $709 million to $743 million. However, deferred license revenues (excluding the addition of New Dimension) declined by $25 million. While this may raise concern among some investors, it is well within the guidance provided by company management following 4Q99. Deferred license revenues were expected to decline by approximately $30 million in 1H00 as the company dealt with seasonal weakness in Europe

Following BMC's July 29, 1999 positive presentation of the current state of its business and its better-than-expected 1Q F00 EPS, its stock value stopped declining and moved upward. It jumped from $47–1/2 on that day to $53–7/8 the next day and to $59–3/4 on August 25, 1999. Between August 3 and 30, 1999, Defendants sold 494,901 shares of their BMC stock for $26.3 million dollars, all allegedly illegal insider trading proceeds.

At a Systems Management Software Conference in Santa Clara, California on August 3, 1999, Watson represented the following to analysts, money and portfolio managers, institutional investors, brokers and stock traders: (1) BMC was successfully integrating New Dimension and Boole & Babbage into its operations, and business was better than expected; (2) European sales were below plan due to slowness in integrating the Boole & Babbage merger, but operations there were now well integrated and would not interfere with BMC's achieving forecasted F00 results; (3) The increase of its DSOs to 86 was due to the acquisition of Boole & Babbage and New Dimension, which had higher DSOs than BMC, but BMC expected DSOs to return to BMC's traditional 60s during the rest of F00; (4) There was continued strong demand for BMC's mainframe MIPS software; (5) BMC expected its operating margins would reach 34–36% by year-end F00; and (6) BMC predicts 3rdQ F00 and 4thQ F00 EPS of $.52–$.56 and $58–$.64, respectively, and F00 EPS of $1.97–$2.05 and 25%–30% EPS growth henceforth.

and integrations of Boole and New Dimension ....
Concern # 4: "The operating margin was lower than usual."
Response: The operating margin was 32.8%, exactly in line with our expectations. Historically, BMC has enjoyed better than 34% operating margins.... We expect operating margins to return to the historical range of 34%–36% in 2H99.
Concern # 5: "The New Dimension contribution was weak, as was European sales."
Response: New Dimension contributed a little more than $15 million in the quarter, which was slightly behind the company's expectation. However, the New Dimension group signed a mid-seven figure contract in the quarter but couldn't recognize it. We fully expect BMC to recognize the contract in 2Q00. As for Europe, growth was weak (i.e., International license revenues were up 17% year over year while Japan and Asia/Pacific were very strong). International integration of the New Dimension and Boole international sales force is likely to take longer than the domestic sales force integration. We would be more concerned if we believed that European sales would continue to grow so anemically; however, we believe that sales are likely to pick up in 2H00 as the sales integration issues are resolved. BMC has already booked two large international license transactions early in the September quarter.
Finally, an A.G. Edwards report by Puricelli, also issued on July 30, 1999 based on the same conference call and follow-up conversations with Watson or Austin, forecast F00 and F01 EPS of $1.97 and $2.47, respectively, a 30% three-year EPS growth rate, and the following quarterly F00 EPS: Q1 $.42; Q2 $.43; Q3 $.52; and Q4 $.60. The report continued,

Revenue exceeded our expectations.... While there were a number of highlights this quarter we won't go in to them in detail. Suffice it to say that BMC management did a great job this quarter not only in integrating New Dimension in to the fold but it was also the first quarter for the combined Boole & Babbage/BMC entity. Despite this obvious and easy distraction they were still able to surprise most of us on the Street with a really good quarter. They are to be commended.

BMC management had never done an acquisition as large as Boole before this and we were a little cautious about them doing two so close together. Integration/execution risk was our main reason for sticking with the Accumulate rating as long as we did. *Now that they have proven their ability to integrate all these new parts we are raising our rating to Buy.*

The Consolidated Amended Complaint asserts that the statements made by company officials between July 29 and September 20, 1999 were false or misleading when they were issued because of the following "concealed facts." BMC was experiencing substantial and increasing resistance from customers regarding purchase of its mainframe software systems, in particular of large or big-ticket systems, because of Y2K concerns. Customers informed sales representatives as early as September 1999 that customers planned to "freeze" all purchases of mainframe software systems until at least after January 2000. As an example, the complaint states that in the Quebec, Canada region, BMC sales representatives informed BMC management that sales quotas would not be met and that management had false expectations for the area, that the goals were too aggressive for Quebec's weak economy and Y2K concerns there, and that the Quebec region would meet only 50% of its sales goals.[23] Furthermore, demand for BMC's mainframe/MIPs software was also softening because of Y2K concerns and deferring substantial software purchases until after the new year.

Furthermore, according to the amended complaint, BMC's weakness in European sales was not due to seasonal factors but to significant problems in integrating Boole & Babbage and New Dimension with BMC, especially the sales forces in Europe. The complaint asserts that management did not even have a plan for completing the integration of the three entities.

Moreover, the complaint alleges that BMC experienced increasing difficulties in closing big-ticket or large sales because of an inadequately trained and ineffective sales force, Y2K concerns of customers, and growing competition from Computer Associates, all casting doubts on BMC's ability to achieve forecasted quarterly EPS. It became even more dependent upon closing a large number of big sales at or near the end of the quarter.

In attempting to integrate the sales forces of the three entities, particularly in Europe, BMC purportedly lost control of over sales execution process there and over accurate forecasting of sales or EPS on a quarterly basis. Defendants allegedly knew that BMC's forecast earnings for the quarter ending 12/31/99 were unreliable and incorrect because BMC had no control over the projections made by members of the sales forces of Boole & Babbage and of New Dimension. The effort to rapidly integrate these sales forces also resulted in several different salespersons attempting to sell different BMC products to the same potential customer, causing customer confusion and complaints that hurt sales. Not only did customers no longer know who was their sales representative, but sales persons, following redefinition of their territories, no longer knew who their supervisors were. Sales people from Boole & Babbage & New Dimensions, who, the complaint asserts, felt animosity toward BMC personnel, were inadequately trained to sell BMC products and their sales productivity was poor, hurting BMC. Furthermore, by July 1999, only 40% of BMC's sales force had been with BMC for eighteen months or more. BMC was thus dependent upon an inexperienced and inadequately trained sales force in in-

23. Defendants point to these allegations as pleadings that fail to state with particularity the facts supporting them, such as how Plaintiffs learned of these alleged oral statements, from whom they learned of them, and how Plaintiffs' sources obtained the information. They also fail to indicate in any way what proportion of BMC's business the Quebec region's sales constituted and what effect lowered sales in that region would have on BMC's overall business.

creasingly large, complex, hard-to-close transactions. These problems with the sales force and its execution were not limited to Europe, but extended to North America, according to the pleadings.

The amended complaint charges that BMC, in order to conceal the nature and extent of these adverse factors, artificially inflated its reported revenues and EPS by inducing customers to accept large software packages while promising them unusually extended payments or offering other side agreements delaying or even forgiving payment under specified circumstances.[24] Furthermore, the amended complaint alleges that because of these problems, Defendants knew that their EPS forecasts were false and not achievable.

On October 6, 1999, BMC disclosed that its EPS for 2ndQ F00, ending 9/30/00, would be $.40–$.42, not the previously forecast $.43–$.45. On October 7, 1999, its stock fell from $72–3/8 to $60–1/2, and continued to fall to as low as $50–1/4 on October 21, 1999. The complaint asserts that BMC executives became determined to push the price up "so that they could complete the insider selling binge they began in 8/99."

Rumors circulated that BMC would report very positive results in late 10/99, and the price of the stock rose to $60–1/8 on October 28, 1999. On October 29, 2000, BMC reported that its EPS for the 2ndQ F00 was higher than indicated on 10/6/99 and in line with earlier forecasts. It issued a release stating that the strength of its flagship PATROL products had offset a **"seasonally weak performance by our European operation."** Nevertheless, the complaint charges that BMC achieved such results only by reclassifying millions of dollars of legal expenses as "nonrecurring" expenses and by drawing down on $35 million in previously deferred revenue.[25] Either Watson or Austin furthermore made the following representations to analysts on October 25–26, 1999:(1) BMC enjoyed a stellar quarter with strong demand for its core products; (2) IBM's recent announcement of a slowdown in mainframe sales due to Y2K concerns did not

24. Requesting dismissal of the claim, Defendants object to Plaintiffs' failure to plead a factual basis for this allegation or provide any supporting information for this vague and unsubstantiated claim. There is no indication as to when such purported improper conduct occurred, when it became company policy to engage in it, the monetary value of affected transactions, the products involved in the alleged transactions, the identities of customers or salespersons involved, or when and if any of the individual Defendants authorized or knew of the alleged agreements. *Greebel v. FTP Software Inc.*, 194 F.3d 185, 202–04 (1st Cir.1999).

25. Defendants object that charges that BMC hid the changes is "disingenuous." The press release in which Plaintiffs assert that BMC misattributed its second quarter results to PATROL sales discloses that litigation expenses would be treated as an unusual charge, as did a press conference that same day and BMC's audited public filings. A–22 at 2; A–23, Transcript of Conference Call on October 25, 1999. at 4–5; A–24; A–16; A–30. They also demonstrate that BMC lacks the ability to voluntarily "draw down" deferred revenue to make current revenue more attractive. Motion to dismiss at p. 57. Moreover, the conclusory allegation is pled without any supporting facts. Furthermore, BMC fully disclosed to the market during its conference call on 10/6/99 that deferred license revenue was expected to decline to $35 million. Ex. A–23, at 5; A–21, at 5. In an October 25, 1999 conference call BMC explained that the reason for the decline was because "prior contracts' exchange rights lapsed and/or product deliverable met." Ex. A–23 at 5. They note that Plaintiffs do not plead any facts to show that the decline in deferred license revenue reported in 2QFY00 was material or that it misled the investing public, and cannot in light of BMC's full disclosures to the market.

indicate any reduction in demand for BMC's products; (3) There was no slowing of demand for BMC products because of Y2K concerns; (4) Despite unexpected disruption caused by the integration of Boole & Babbage and New Dimension, particularly in Europe, the integration of sales force was nearly complete and European operations would improve; (5) European sales execution now met BMC's standards and better European performance was expected in the third and fourth quarters of F00; (6) the European sales problem was an execution issue and did not reflect any fundamental problem with BMC's European operations or demand for its products

26. The Court again summarizes reports issued by analysts after discussions with BMC executives.

After extensive discussions with Watson or Austin, Dain Rauscher Wessels issued a report on 11/12/99 authored by its Vice President, Sara Mattson, based on their talks and repeated information provided by BMC. It forecast F00 and F01 EPS of $1.96 and $2.52, a 25% three-year EPS growth rate, and the following F00 and F01 quarterly EPS for BMC:

| QTR | EPS/F00 | EPS/F02 |
| --- | --- | --- |
| 1st | $ .42A | $ .54 |
| 2nd | $ .44A | $ .57 |
| 3rd | $ .52 | $ .66 |
| 4th | $ .58 | $ .74 |
| | $1.96 | $2.52 |

The report stated that Dain Rauscher Wessels believed that BMC offered two of the hottest opportunities in its systems and data management software. It commented, "The addition of the Boole and New Dimension product lines enhances BMC's product portfolio in these core markets, represents cross-selling opportunities, and provides entry into new software categories (e.g., storage management)."

After BMC reported its better-than-expected 2ndQ F00 results, BMC stock jumped to $65–1/2 on 10/29/99 and to its Class Period high of $86–5/8 on 1/3/00. At the same time, according to the amended complaint, BMC insiders renewed their illegal massive insider selling by unloading 590,114 shares of their BMC stock for $36.7 million in illegal insider-trading proceeds between 10/28/99–1/19/99.

in Europe; and (7) BMC expected third and fourth quarter F00 EPS of $.53–$.54 and $.59–$.60, for an F00 EPS of at least $1.93.

On November 1, 1999, Watson told securities analysts, money managers, and institutional investors at the Deutsche Banc Alex. Brown 1999 Technology Conference that BMC was satisfied with the previous third quarter F00 EPS forecast of $.53, that execution issues with the sales force in the 2ndQ F00 had largely been resolved, that the integration of BMC, Boole & Babbage, and New Dimension was successful, and that he was "bullish" on the outlook for BMC's 3rdQ F00 and beyond.[26]

On November 30, 1999, Prudential Securities issued a report "initiating coverage" on BMC by Crook following extensive discussions with Watson and Austin and based on information provided by them. The report forecast the following EPS results for F00: 1Q $.42A; 2Q $.44A; 3Q $.53; 4Q $.60; and total EPS for F00 $2.02. It found benefits in BMC's recentralization of computing and its recognition of the imperative to move to an e-business model, which were driving growth as businesses embrace e-commerce. On December 7, 1999 Warburg Dillon Read issued a report, written by Jordan Klein after discussions with Watson and Austin, that projected 27% five-year EPS growth and the following F00 and F01 results for BMC:

| QTR | EPS/F00 | EPS/F01 |
| --- | --- | --- |
| 1st | $. 42A | $ .53 |
| 2nd | $. 44A | $ .54 |
| 3rd | $. 53 | $ .68 |
| 4th | $. 59 | $ .75 |
| Year: | $1.98 | $2.50 |

The report stated that it expected positive near-term conditions that would improve near the end of the year, that BMC might exceed its Q3 F00 expectations, and that the author believed that "BMC has corrected European sales force issues related to the integration [of] Boole & Babbage that caused Q2 revenue to fall short of internal estimates."

Similarly on December 17, 1999, Paine Webber issued a report by Buttigieg after extensive discussions with Watson and Austin that forecast the following F00 and F01 quarterly results for BMC:

878

Lead Plaintiffs contend that Defendants knew that these statements made between 10/29/99–12/17/99 were false or misleading for the same reasons it cited for statements made between July 29 and September 20, 1999.

On January 4, 2000, BMC stock rose as high as $85–1/8 before closing at $77, as rumors spread that BMC would make a negative announcement. The next day, before the market opened, BMC disclosed that its 3rdQ F00 results would be substantially worse than projected due to serious problems with its sales force, a failure to close several large deals, a lack of large mainframe software transactions that had caused a major revenue shortfall, customer refusals to purchase due to Y2K worries, and serious weakness in its European operations. BMC's stock plummeted to $47 on a volume of 60 million shares and continued to fall the next day to $41–1/4 on a volume of 42 million shares.

After these partial disclosures, according to the amended complaint, Defendants continued to mislead the market about the demand for BMC mainframe products and to artificially inflate the value of BMC stock. A report issued by S.G. Cowen Securities, Inc. on January 7, 2000, after discussions with Watson and Austin, stated, "Management claimed to see no slowing in mainframe capacity demand."

On January 25, 2000 BMC disclosed its poor 3rdQ F00 results, i.e., EPS of only $.41, far below forecasted levels and a decline from 3rdQ F99 and 2ndQ F00 EPS, with revenues of $426 million, $50 million below forecasts. Its DSOs increased to 86 from 84 at the end of the 2ndQ F00. Several top sales executives and managers were fired. During a confer-

ence call with analysts, Watson remarked, "Shame on us." Watson conceded that in eighteen months BMC had tripled its sales force so that 60% of its sales representatives were new to BMC or the companies it had acquired, and that the sales force execution "has caused us great stress as a company," while the new sales staff constituted "a huge transition."

Yet on January 25, 2000 Watson still claimed, "During the third quarter, the company faced an unusual set of challenges—some of which we believe were unique to this quarter and therefore behind us . . . ." During a conference call that same day and in subsequent conversations with analysts, Watson stated that with respect to IBM's anticipated MIPS growth, "we think we are okay" and that "the underlying fundamentals of [BMC's] business are very strong."

On April 25, 2000, BMC surprised analysts by announcing a positive fourth quarter earnings of $.49 a share, $.02 above the Street estimate, and a 23% increase in revenues from the previous year, to $476 million. That same day Watson and Austin during a conference call with analysts were positive about prospects for the next quarter and the remaining fiscal year. Watson commented that they expected to see "margin improvement" and growth of new business segments and that BMC had addressed and overcome the problems plaguing the company during the third quarter. Austin also was optimistic about an earnings increase and claimed, "We're in so much better shape . . . not only in closing the fourth quarter but . . . for the new year." Watson further indicated that even if IBM business slowed, it would not adversely affect the company because new business would offset the lag. He further

| QTR | EPS/F00 | EPS/F01 |
|-----|---------|---------|
| 1st | $ .42A | $ .52 |
| 2nd | $ .44A | $ .55 |
| 3rd | $ .53 | $ .68 |

| | | |
|-----|-------|-------|
| 4th | $ .58 | $ .72 |
| Year | $1.96 | $2.48 |

stated that BMC had experienced a "spectacular rebound." Austin also appeared on CNN that same day and stated, "[O]ur traditional business, our mainframe business, is very strong and is very profitable.... [We] really bounced back this quarter after somewhat of a disappointing third quarter, but as we look to our future we set expectations to be in excess of a 20 percent growth company both top line and bottom line ...."

The next day, based on BMC's representations, its stock was upgraded by a number of analysts. By April 28, 2000, the stock price jumped to nearly $47 per share from $37 per share prior to the statements on April 25, 2000.

On June 18, 2000, Defendants met with institutional investors in Boston, Massachusetts and affirmed that Street estimates of $.45–$.46 a share were on target. The next day CIBC analyst Melissa Eisenstat reported that Austin had told her that Information Technology budgets for its customers were "huge" and that several $10 million deals had already closed.

The amended complaint asserts that these statements made between January 5, 2000 and June 18, 2000 were false and misleading when made for the following reasons. BMC was continuing to experience customer resistance to purchasing mainframe computer software systems. In January 2000, BMC sales representatives requested and were given a meeting with BMC's Director of Marketing, William Kate ("Kate"), and told him of their continued inability to make sales. Kate, in a regularly scheduled meeting with Gardner and other individual Defendants, informed them of these concerns.[27] Furthermore, IBM mainframe/MIPS sales

continued to decline, as they had done on a year-over-year basis for the last several quarters. Defendants allegedly were aware of this slowdown because BMC management communicated regularly with IBM, as Austin disclosed in an interview on Radio Wall Street on October 10, 1999, although Plaintiffs provide no specifics about information allegedly exchanged or when and between or among whom, and because IBM's slowdown necessarily translated into lowered demand for BMC mainframe software systems. BMC knew that customers were delaying purchases of mainframe software from BMC because they were anticipating purchasing forthcoming versions of IBM's mainframe, with IBM's MIPS cycle facing obsolescence and a new cycle expected to be released in late 2000. Furthermore, because during 1998 and 1999 customers had purchased ahead extra MIPS capacity for their computer systems in preparation for possible Y2K problems, they had not additional need for further mainframe computer capacity during 2000. Finally, Defendants allegedly knew or recklessly disregarded that there would be a slowdown in initial product license fees from new customers and upgrade fees from customers for added MIPS capacity because customers were not purchasing MIPS.

On July 5, 2000, BMC disclosed preliminary earnings far below analysts' expectations, i.e., 1stQ F01 earnings between $.18–$.21 a share, in contrast to previous estimates of $.46 a share. BMC estimated that its revenues for the 1stQ ending 6/30/00 would be in the range of $365 million to $375 million, less than half the analysts' estimates. BMC further project-

---

27. Defendants challenge these allegations as non-specific and lacking particularities about how Plaintiffs learned of these alleged oral statements, from whom they leaned of them and how Plaintiffs' sources obtained the information. Furthermore, they question the truth of such allegations because Gardner left BMC before January 5, 2000. Ex. A–31.

ed that its net earnings would be between $47–51 million.

On that same day, *Business Wire* reported that Watson blamed these bleak earnings on a shortfall in mainframe license revenues, the same aspect of BMC's business that Austin had two months previously proclaimed to be "very strong and very profitable."

Subsequently, the price of BMC stock plunged from $35 per share to $22, by approximately 40%, a new 52–week low. Watson admitted, "We've got a lot of work to do."

On July 25, 2000, BMC admitted that its profits fell 53%, or $.20 a share, in the three months ending 6/30/00. During a conference call with analysts, Watson conceded that BMC expected revenues generated from mainframe products to decline further by 10%–20%. After BMC announced its 1stQ F01 earnings, the price of BMC's stock fell below $20 and it became the second worst performing stock in the Standard & Poor's 500 index that year.

The amended complaint provides charts (at pp. 28–33) to demonstrate alleged insider trading by individual Defendants, who sold 1,364,215 shares at artificially inflated prices for more than $75.4 million, out of line with their prior trading practices. During the Class Period, Austin sold 31% of his total shares; Watson sold 13%; Wilson sold 81%; Van Duyn sold 71%; Solcher sold 70%; Klausmeyer sold 68%; Beauchamp sold 53%; Morse sold 40%; Morris sold 28%; and Weiss sold 27%.

The amended complaint insists that the PSLRA's safe harbor for forward-looking statements [28] does not apply here because

---

**28.** The PSLRA establishes a "safe harbor" shielding a "forward-looking" statement from Rule 10b–5 liability where such a statement is made by a natural person unless defendants prove that it was made with "actual knowledge ... that the statement was false and misleading." 15 U.S.C. § 78u–5 and § 78u–5(c)(1)(B)(I). A statement is "forward-looking" if, *inter alia,* it is

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

© a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer ....

15 U.S.C. § 78u–5(I)(1)(A).

The safe harbor protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. 15 U.S.C. § 78u–5(c)(1)(A)(I) and (ii). If a statement is "accompanied by meaningful cautionary statements," the defendants' state of mind is not relevant. *Harris v. Ivax Corp.,* 182 F.3d 799, 803 (11th Cir.1999), *citing* H.R. Conf. Rep. 104–369, at 44 (1995), reprinted in 1995 U.S.C.A.A.N. 730, 743 ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement.") Where the forward-looking statement is not accompanied by cautionary language, plaintiffs must demonstrate that the defendant made the statement with "actual knowledge" that it was "false or misleading." 15 U.S.C. § 78u–5(c)(1)(B).

The safe harbor provision does not apply where the defendants knew at the time that

none of the statements, including the oral ones,[29] is identified as forward looking or that actual results "could differ materially from those projected," nor were they accompanied by meaningful cautionary statements identifying important factors that might result in materially different results.[30] Moreover, at the time such statements were made, the speakers knew the statements were false and because the statements were authorized and/or approved by a BMC executive officer who knew they were false.

The amended complaint alleges two counts under the Securities Act of 1934:(1) violation of § 10(b) and Rule 10b–5 by all Defendants; and (3) violation of § 20(a) against BMC and Watson.

### Plaintiffs' Motion to Strike

Pursuant to Fed.R.Civ.P. 12(f), Plaintiffs move to strike a large number of exhibits submitted by Defendants in their Appendix to their Memorandum in support of their motion to dismiss on the grounds that consideration of matters outside the pleading is improper in review of a motion to dismiss. Because resolution of this motion affects consideration of the motion to dismiss, the Court addresses it first.

This Court observes that usually a court limits its review under a Rule 12(b)(6) motion to the facts stated in the complaint and any documents either attached to the complaint or incorporated into it, or it converts the motion to one for summary judgment under Rule 56, with notice to the parties and an opportunity to be heard. Fed.R.Civ.P. 12(c). The Fifth Circuit has held that in reviewing a Rule 12(b)(6) motion to dismiss a claim for securities fraud on the pleadings, the district court may take judicial notice of and consider the

---

they were issuing statements that the statements contained false and misleading information and thus lacked any reasonable basis for making them. *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1213 (1st Cir.1996); *Gross v. Medaphis Corp.*, 977 F.Supp. 1463, 1473 (N.D.Ga.1997); *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d 901, 930 (D.N.J.1998). The PSLRA restricts review of forward-looking statements to those specified in the complaint. 15 U.S.C. § 78u–4(b)(1). Thus the Court must examine piecemeal the statements made by the company as expressed in the pleadings.

**29.** 15 U.S.C. § 78u–5(I)(2) deals specifically with oral forward-looking statements and says that an oral representation would meet the statutory requirements for a "forward-looking statement" in [15 U.S.C. § 78u–5(I) ](1)(A)

  (A) if the oral forward-looking statement is accompanied by a cautionary statement—
  (I) that the particular oral statement is a forward-looking statement; and
  (ii) that the actual results might differ materially from those projected in the forward-looking statement; and
  (B) if—
  (I) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;
  (ii) the accompanying oral statement referred to in clause (I) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and
  (iii) the information contained in the written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

**30.** Under the fact-intensive test for materiality in securities fraud cases established in *Basic, Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), undisclosed information is "material" if "there is a substantial likelihood that the disclosure would have altered the 'total mix' of information available" and thereby affected the reasonable investor's decision to buy or sell stock. *See also, e.g., Helwig v. Vencor, Inc.*, 251 F.3d 540, 555 (6th Cir.2001)(*en banc*); *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir.2000).

contents of relevant public disclosure documents that are required by law to be filed with the Securities Exchange Commission ("the SEC") and are actually filed with the SEC, with the restriction that these documents may be considered only for the purpose of determining what statements they contain and not for proving the truth of their contents. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017–18 (5th Cir.1996), *citing and adopting rule of Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991).

■ The Court may also consider documents "integral to and explicitly relied on in the complaint," that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint. *Phillips v. LCI Intern., Inc.*, 190 F.3d 609, 618 (4th Cir.1999); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th Cir.1999); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808–09 (2d Cir.1996). If the plaintiff fails to attach a public document upon which he relies to his complaint, the defendant is entitled to produce such a document in support of a motion to dismiss if the document is integral to the complaint. *Id.* at 809. The Court may also take judicial notice of stock prices and

documents of public record. *Hausberg v. CompUSA*, No. 3:94–CV–1151–H, 1995 WL 811960, at *9, 1995 U.S. Dist. LEXIS 20333, at *31 n. 14 (N.D.Tex. Oct. 30, 1995); *Davis v. Bayless*, 70 F.3d 367, 372 n. 3 (5th Cir.1995).

Here Plaintiffs specifically challenge the chart compiling data that purportedly represents percentages of stock shares sold by Defendants during the Class period and at similar time periods for the three previous years (Ex. C–1), which Plaintiffs claim is distorted.[31] They further contest documents purporting to be transcripts from five BMC conference calls with analysts. Exs. A–18, A–21, A–26, A–29. Third, Plaintiffs object to Exhibits C–2 through C–12, Forms 3, 4, and 5 of various Defendants as unauthenticated and inadmissible hearsay improperly used to rebut Plaintiffs' allegations of insider trading. Finally Plaintiffs object to documents filed by BMC with the SEC between 1996–2000. Some (Exhibits A–19, A–24, A–27, and A–30) were filed during the Class Period, but most were filed either before or after the Class Period (A–2 through A–16, and C–13 through C–16). Plaintiffs emphasize that none of the submissions is referenced in the Consolidated Amended Complaint,[32] they object to the authenticity of the documents, they argue that Defendants improperly at-

---

**31.** Specifically Plaintiffs contend that the chart distorts pre-Class Period stock sales by Defendant Morse. Defendants respond by pointing out that Plaintiffs have not alleged that Morse made any challenged statements or that Morse could have controlled the challenged statements, Morse's sales of stock during the Class Period cannot as a matter of law give rise to a strong inference of scienter. *Kurtzman v. Compaq Computer Corp.*, Civ. Action No. 99–229, slip op. at 61–62, 82–83, 123 (S.D.Tex. Dec. 12, 2000). Nevertheless, if the court does consider them, Morse's July 28, 1998 sale of 100,000 shares of stock just one day before the start of the prior analogous period (July 29, 1998–July 5, 1999) and the fact that the class period is defined by the

issuance of certain company announcements, with Morse's first Class–Period trade occurring on August 4, 1999, the sale should be considered in determining whether Morse's sale of stock during the Class Period gives rise to a strong inference of scienter.

**32.** In particular, because the conference call transcripts are not referenced in the complaint, they should not be considered. *Cooper v. Pickett*, 137 F.3d 616, 622–23 (9th Cir. 1997); *In re Scholastic Sec. Litig.*, No. 97 Civ. 2447(JFK), 1998 WL 560052, at *2, 1998 U.S. Dist. LEXIS 13910, at *4 (S.D.N.Y. Sept. 1, 1998).

tempt to use some to contest Plaintiffs' pleading allegations, and they charge that Defendants improperly ask the Court to consider several for the truth of the matter asserted in them.

Plaintiffs point out that an adjudicative fact cannot be judicially noticed unless it is "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). Because accuracy of the chart of stock sales (Ex. C–1) is disputed, Plaintiffs maintain that the Court cannot take judicial notice of it. They note that Defendants suggest that the chart is a matter of public record, from BMC's SEC filings, without any authentication or supporting documentation. Ex. C–1, n.1. More important, insist Plaintiffs, since the chart is not "capable of accurate and ready determination," Fed.R.Evid. 201(b), and because it is hearsay, Plaintiffs urge the Court to strike it.

If the Court accepts the documents, Plaintiffs claim that they have a right to discovery under the PSLRA. 15 U.S.C. § 78u–4(b)(3)(B)(mandatory stay of discovery may be lifted "to prevent undue prejudice").

In response, Defendants maintain that this Court has already rejected such arguments in denying a motion to strike filed by the same lawyers in *In re Landry's Seafood Restaurants, Inc. Sec. Litig.*, H–99–1948, slip op, at 60 (S.D.Tex.2001). The PSLRA requires dismissal of allegations that lack a basis, i.e., factual support. Plaintiffs wrongly argue that because they chose not to attach or name many of the SEC filings on which their allegations are based, Defendants cannot use those filings to test Plaintiffs' allegations. Defendants disagree and insist that they can use relevant documents to further the purpose of the PSLRA, i.e., dismissal of frivolous

cases at the earliest stage of the litigation. *See, e.g., Sturm v. Marriott Marquis Corp.*, 85 F.Supp.2d 1356, 1366 (N.D.Ga. 2000)("The district courts cannot fulfill their gatekeeping role if plaintiffs are free to quote selectively or out of context from documents that they rely upon, and avoid further examination of the documents by not attaching them to the complaint"); *Bryant v. Avado Brands*, 187 F.3d 1271, 1278 (11th Cir.1999); *In re Burlington Coat Factory*, 114 F.3d 1410, 1426 (3d Cir.1997)(consideration of relevant documents precludes plaintiffs from "maintain[ing] a claim of fraud by extracting an isolated statement from a document"; "Plaintiffs cannot prevent a court from looking at the texts of documents on which its claim is based by failing to attach or explicitly cite them."). Courts may routinely consider not just documents named in Plaintiffs' complaint, but even documents that, if not named, are "pertinent," "central" or "integral to [Plaintiffs'] claim." *Bryant*, 187 F.3d at 1281; *Landry's Seafood*, Mo, H–99–1948 at 3, n.8; *Sturm*, 85 F.Supp.2d at 1356. The Fifth Circuit recognizes the incorporation-by-reference doctrine. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir.2000)(" 'Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.' "); *Lovelace*, 78 F.3d at 1018 (even if not attached, court can consider "documents ... incorporated in the complaint"); 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1327 at 762–63 (2d ed.1990)("when [a] plaintiff fails to introduce a pertinent document as part of his pleading, [a] defendant may introduce the exhibit as part of his motion attacking the pleading").

■ As for Plaintiffs' specific challenges, Defendants point out that in response to allegations that Defendants' stock trading practices reflect scienter under the motive and opportunity doctrine, to be discussed later, Forms 3, 4, and 5 are the only publicly filed documents that reveal holdings and transactions involving the BMC stock held by each individual Defendant and the only documents upon which Plaintiffs' allegations can be based. Thus because Plaintiffs relied on these documents and because they are integral to determining whether Plaintiffs allegations give rise to a strong inference of scienter, they are incorporated by reference even though they are not mentioned in the amended complaint. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999)(rejecting motion to strike and approving consideration of Form 3 and 4 filings where a complaint contained insider trading allegations but failed to name filings as source). Therefore, since the documents are relevant to Plaintiffs' allegations of scienter, the Court may consider these documents under the incorporation-by reference doctrine and may take judicial notice of them because they were required to be and were actually filed with the SEC under SEC rules under penalty of perjury. As for the chart, Exhibit C–1, Defendants point out that it is verified by counsel's signing the memorandum, was included only for the court's convenience as a summary of information included in SEC filings attached to the memorandum (Forms 3, 4, and 5 filed by each individual Defendant, Exs. C–2 though C–12), and the trading information contained in the 1997–2000 proxy statements filed by BMC with the SEC. Under Fed.R.Evid. 1006, this summary chart may be included because the underlying documents are also submitted for consideration by the Court and thus not hearsay. The transcripts are also incorporated by reference in select statements from each conference call included in the amended complaint. Moreover, because these conference calls included forward-looking statements accompanied by meaningful cautionary statements identifying risk factors, relevant under the PSLRA's safe harbor provision, 15 U.S.C. § 78u–5(c)(1), to be discussed *infra,* under 15 U.S.C. § 78u–5(e)("On any motion to dismiss based upon subsection (c)(1) of this section, the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant"), the Court must consider the transcripts. Furthermore, the court reporter's certificate attached to the transcripts, attests to their accuracy and authenticity. Finally, although Defendants argue that public filings made prior to the Class Period are irrelevant, the Fifth Circuit case on which they rely, in which the court specifically considered disclosures from the defendant's 1991 and 1992 prospectuses to defeat the plaintiff's claim of nondisclosure of business risks during the class period from October 1993 to May 1994, undermines Defendants' contentions. *Lovelace,* 78 F.3d at 1017, 1019–20.

Because the Court fully concurs with Defendants' arguments, the Court denies Plaintiffs' motion to strike.

### Defendants' Motion to Dismiss (# 73)

■ Charging that the amended complaint pleads fraud by hindsight and constitutes the kind of strike suit abuse that the PSLRA was intended to combat by imposition of stringent pleading requirements, Defendants emphasize that the PSLRA requires Plaintiffs (1) to identify each allegedly misleading statement and provide reasons why it is misleading; (2) if Plaintiffs' allegations are based on "infor-

mation and belief," they must state with particularity all the facts on which that belief is based;[33] and (3) Plaintiffs must state with particularity facts giving rise to a strong inference that Defendants acted with the required state of mind for each act or omission alleged to have violated the statute. 15 U.S.C. § 78u–4(b)(1)–(2). If Plaintiffs fail to satisfy any of these requirements, the court must dismiss the suit. 15 U.S.C. § 78u–4(b)(3).

■ As its first ground for dismissal, Defendants emphasize that the amended complaint fails to allege with any particularity that nine of the eleven individual Defendants made any representations or participated in any way in the alleged scheme to defraud. Moreover the amend-

ed complaint only conclusorily alleges that Defendants' scienter was based on their executive positions, their involvement in day-to-day management of BMC's business, their access to internal corporate documents, conversations with corporate officers and employees, and their attendance at management and Board meetings. *Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 283 (D.Mass.1998)(finding that "inferences that the defendants by virtue of their positions within the company, 'must have known' about the company problems when they undertook the allegedly fraudulent actions ... are precisely the types of inferences which this court, on numerous occasions, has determined to be inadequate to withstand the special pleading require-

**33.** The Court observes that when a pleading is based on "information and belief," it must be pled with particularity under 15 U.S.C. § 78u–4(b)(1) ("allegations regarding false statements or omissions that are made on information and belief must state with particularity all facts on which that belief is formed"). When a pleading instead is based on investigation of counsel, there is a difference of opinion whether the higher pleading requirements apply. Once again there is no appellate court ruling on this issue and the district courts are split.

In contrast to those holding that there are only two types of allegations, those based on personal knowledge that do not trigger more detailed pleading and those not based on personal knowledge, including investigation of counsel, that do, are *inter alia* the following which refuse to apply different standards: *In re Theragenics Corp. Securities Litigation,* 105 F.Supp.2d 1342, 1350–51 (D.Ga.2000)(holding "that allegations based on the investigation of counsel are equivalent of allegations based on information and belief" and that "to rule otherwise would elevate form over substance and allow plaintiffs to avoid the Reform Act's mandate merely by cloaking with a license to practice law the information and belief on which the complaint is based"); concluding that Congress determined in enacting the PSLRA that Federal Rule of Civil Procedure 11, providing that by presenting a pleading to the court an attorney is certifying

that he conducted "an inquiry reasonable under the circumstances," was not enough to plead securities fraud (and cases cited therein); *In re Equimed, Inc.,* No. 98–CV–5374 NS, 2000 WL 562909, *3–4 (E.D.Pa. May 9, 2000)("To distinguish between 'information and belief' and 'investigation of counsel' is meaningless; it would permit evasion of the clear intent of a statutory mandate."); *In re Green Tree Financial Corp. Stock Litigation,* 61 F.Supp.2d 860, 872 (D.Minn.1999)("because an attorney is required under Rule 11 of the Federal Rules of Civil Procedure, to investigate claims before filing a complaint, plaintiffs should not be allowed to avoid the heightened pleading standard by claiming 'investigation of counsel' "); *Lirette v. Shiva Corp.,* 999 F.Supp. 164, 165 (D.Mass.1998)("enhanced pleading requirement" applies to pleadings based on "investigation by plaintiffs' counsel"). Because this Court views the purpose of the PSLRA to tighten requirements for pleading a viable securities fraud action to protect companies from unfounded suits, it agrees with these courts that conclude that the particularized pleading requirement also applies to allegations based on investigation of counsel. It does not, unlike the Ninth Circuit, require that every single fact upon which a plaintiff's beliefs are based be pled to demonstrate false or misleading statements, but it does conclude that a plaintiff must plead sufficient facts to support such allegations.

ments in securities fraud cases"); *Branca v. Paymentech, Inc.*, No. Civ. A. 3:97–CV–2507–L, 2000 WL 145083, *10–11 (N.D.Tex. Feb. 8, 2000)("Allegations that party knew or should have known that false representations were being made by virtue of his position within a company are, as a matter of law, insufficient to plead scienter."). Plaintiffs must allege what actions each Defendant took in furtherance of the alleged scheme and specifically plead what he learned, when he learned it, and how Plaintiffs know what he learned. *McNamara v. Bre–X Minerals Ltd.*, 57 F.Supp.2d 396, 423 (E.D.Tex.1999)(dismissing claim where statement attributed to group without any basis).[34] Thus claims against Defendants Gardner, Beauchamp, Morse, Weiss, Wilson, Morris, Van Duyn, Klausmeyer, and Solcher should be dismissed pursuant to Fed.R.Civ.P. 9 and the PSLRA.

■ Second, Defendants urge that Plaintiffs have failed to satisfy the PSLRA's particularity requirements. Because BMC's stock price did not steadily increase over the Class Period, Plaintiffs have merely lumped public statements by or about BMC into three smaller periods (July 29–September 20, 1999; October 26–December 17, 1999; and January 5–June 18, 2000) and follow each with a laundry list of "true but concealed facts." They fail to show which of the statements are misrepresentations and to specify the reasons why they are false or misleading or how they relate to the "true but concealed facts." The three paragraphs delineating "true but concealed facts" never quote from or refer to any internal reports or documentation and never provide any factual support for the oral statements to management alleged by Plaintiff on information and belief.

Third, Defendants maintain that the complaint does not provide the factual basis for Plaintiffs' allegations based on information and belief, but only conclusory assertions. It does not refer to or cite any internal reports or documentation to support Plaintiffs' alleged "true but concealed facts," which lack sufficient indicia of reliability to satisfy the PSLRA.

■ Fourth, Defendants assert, the amended complaint fails to allege facts giving rise to a strong inference that Defendants intended to deceive, manipulate or defraud anyone. 15 U.S.C. § 78u–4(b)(2); *In re Paracelsus Corp. Sec. Litig.*, 61 F.Supp.2d 591, 595 (S.D.Tex.1998) ("Scienter is 'a mental state embracing intent to

---

34. This Court, in *Kurtzman et al. v. Compaq et al.*, H–99–779 slip op. at 125–26 (Dec. 12, 2000)(# 66), incorporated into the record of the instant suit as Ex. 2 to Instrument # 80, addressed these same issues and made the following rulings:

   ... Plaintiffs place much emphasis on the internal sales forecast they conclusorily allege alerted Defendants to Compaq's problems as early as August 1998. Ye, as pointed out by Defendants, Plaintiffs fail to provide any significant details regarding this memorandum that are critical to proving actual knowledge. Specifically, they have emphasized the absence of any indication of who prepared the forecast, to whom it was provided, and, more significantly, its specific contents and the accuracy or certainty of its predictions. Without at least some of this information, the memo by itself is merely vague, unspecified insider information that is insufficient to raise even a reasonable, no lest strong, inference of scienter for securities fraud,

   Plaintiffs also rely on knowledge acquired by reason of the high level positions held by Defendants at Compaq. This global allegation, too, lacks any factual specifics as to what information they were exposed, how, and when. In view of the purpose of the PSLRA amendments, this Court finds that Plaintiffs rely on too minimal and conclusory allegation of incomplete motive and opportunity by reason of Defendants' positions at Compaq to attempt to satisfy the scienter standard under the PSLRA.

deceive, manipulate or defraud.' ") (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (n.12) (1976)). There are no details as to what Defendants knew, when and how they knew it, and the basis for Plaintiffs' allegations. Nor does the amended complaint demonstrate that they knew their statements were false when made. Instead the complaint merely alleges fraud by hindsight, i.e., because BMC's stock price dropped, Defendants must have known it would occur beforehand. Conclusory allegations that they had the requisite scienter based on their executive positions at BMC, their involvement in day-to-day management of its business, their access to internal corporate documents, their conversations with corporate officers and employees, and their attendance at management and Board meetings are insufficient; they need to provide details about alleged negative internal reports, when they were prepared, who prepared them, their content, the sources from whom plaintiffs obtained such information, etc. *Coates v.*

*Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 921 (N.D.Tex. 1998). Furthermore, Plaintiffs allege scienter based on the motive and opportunity test which at least four Circuit Courts of Appeal and two district judges in the Southern District of Texas have rejected. Moreover, the scope and timing of Defendants' stock sales are not sufficient to give rise to a strong inference of scienter. In particular, the sales by Watson and Austin, the only Defendants who made statements challenged by the amended complaint, are clearly not suspicious or out of line with their earlier selling practices, and sales by the others are not relevant.

Fifth, Defendants argue, the amended complaint fails to state a legally actionable claim. Defendants cannot be held liable for any of the following: alleged misstatements rendered immaterial by BMC's own prior disclosures [35]; alleged misstatements consisting solely of vague and optimistic statements of opinion about BMC's future performance [36]; alleged misstatements

**35.** Defendants point out that one month before the Class Period began, BMC filed its 10–K Annual Report for fiscal 1999 (Defendants' Ex. A–16) with the SEC publicly disclosing the following risks of its business and future prospects and warnings: (1) BMC operates in a "highly competitive industry" and directly competes with companies like IBM and Computer Associates (7, 9, 28); (2) there is no assurance that BMC's customers will continue the past practice of upgrading their computer processing capacity, measured in MIPS, the measure on which BMC's license fees are based, and thus BMC's revenues and operating results could be impacted adversely (17, 28); (3) Each quarter BMC's sales are "backend" loaded, i.e., because most BMC customers close sales only at the end of a quarter, quarterly sales are difficult to predict and BMC cannot know if it will meet quarterly goals until the final days or day of each quarter (26) [Defendants highlight the fact that in the instant action none of the alleged misrepresentations was made during the last weeks of a quarter and no Defendant traded during

the last 30 days of any quarter]; (4) BMC stock is highly volatile (26); (5) BMC's stock price is based on current expectations of "sustained future revenue and earnings growth rates," so if the company failed to meet revenue projections in any given period, a "significant adverse effect" on its share price could result (26); (6) Concern for Y2K could cause customers to defer big software purchases from BMC, and BMC might have a harder time making sales even when the urgency subsided in 2000 (26–27); (7) the recent acquisitions of New Dimension and Boole & Babbage might result in integrations problems, in particular the integration of personnel and operations, and key people might leave the company as a result (28–29).

Similar warnings were repeated by BMC throughout the Class Period in various disclosures. Exs. A–2 through A–30.

**36.** "Projections of future performance not worded as guarantees" are not actionable under the federal securities laws because no reasonable investor would consider such

made by independent stock analysts that BMC did not control; and alleged misstatements expressing management's beliefs and expectations about the company's future performance that fall within safe harbor rules governing forward-looking statements.[37]

Finally, Defendants urge, because the amended complaint fails to state a cause of action for securities fraud as a primary liability claim under Section 10(b) of the Exchange Act or Securities and Exchange Commission Rule 10b–5, Plaintiffs' secondary control person liability claim under Section 20(a) of the Exchange Act against BMC and Watson also fails. *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619–20 (5th Cir.1993) (to prevail on a claim under § 20(a) of the Exchange Act, plaintiff must establish an underlying violation of the federal securities laws), *cert. denied*, 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).

■■■ Defendants also challenge the "true and concealed facts," vaguely stated by Plaintiffs as allegedly rendering BMC's public statements false, on the grounds that the pleading of these facts fails to satisfy the PSLRA's requirements of particularity, factual basis, and strong inference of scienter. For instance, in the context of conclusory allegations that BMC encountered problems in integration of the sales forces of Boole & Babbage and New Dimension with its own sales force, Plaintiffs charge fraud in Defendants'

statements that the integration was proceeding swiftly and was "about done." Vague, loose optimistic allegations that amount to little more than corporate cheerleading are "puffery," projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts. *Krim*, 989 F.2d at 1446; *Raab*, 4 F.3d at 289. The PSLRA's safe harbor provisions would also protect most of these statements. Furthermore, BMC's public warnings about risk factors affecting its prospects, contained in public filings, stock analysts' reports, and conference calls, render immaterial the alleged misstatements. *Atkins v. Hibernia Corp.*, 182 F.3d 320, 326 (5th Cir.1999)(where a public document fully discloses information material to the allegedly concealed matter, dismissal is appropriate under Rule 12(b)(6)). For instance, BMC publicly stated that integration of the three entities' sales forces was challenging and was taking more time to complete than integration of their products. See, e.g., Ex. A–21, Transcript of Oct. 6, 1999 Conference Call, at 18–19; A–11: Form S–4 Registration Statement (filed Nov. 13, 1998) at 13; Ex. A–14: Amended 10–Q Report Third Quarter Fiscal 1999 (filed Feb. 24, 1999); Ex. A–13: Amended 10–Q Report for Second Quarter Fiscal 1999

statements material. *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993).

Furthermore, most of these forward-looking purported misstatements are protected by the SEC's safe harbor rules under 15 U.S.C. § 78u–5.

**37.** A defendant cannot be held liable for statements identified as forward-looking and "accompanied by meaningful cautionary state-

ments identifying the factors that could cause actual result to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(I). If no cautionary language accompanies the forward-looking statement, a plaintiff must still plead facts demonstrating that the defendant had "actual knowledge" that a forward-looking statement was false when made. *Id.*, §§ 78u–4(b)(1), 78 u–5(c)(1)(B).

(filed Feb. 22, 1999), at 21. Early disclosures were later supplemented. A–16: 10K Annual Report for Fiscal 1999 (filed June 28, 1999) at 33.[38]

Observing that Plaintiffs have conclusorily alleged that animosity between employees of pre-acquisition BMC and those of Boole & Babbage and New Dimension caused sales turnover to increase and "seasoned" salespersons to depart from BMC, Defendants emphasize that no details are provided about the alleged animosity, such as where, when, between whom, and whether management ever knew. Even if the allegations were true, BMC disclosed in press releases from July 1999–January 2000 that there was a danger of corporate culture clash and a risk that key personnel might leave. In its SEC filings BMC often indicated that it could lose and had lost key personnel during integration of the acquisitions. Ex. A–27 at 19. Analyst reports cited by Plaintiffs also demonstrate that the investing public was well aware that the integration was negatively affected by "turf wars" in Europe. Exs. B–4 at 12–13; Ex. B–2; Ex. B–1. Furthermore, the analysts continued to indicate concern about integration even after BMC announced its fourth-quarter fiscal 2000 rebound. B–6.

■ Plaintiffs' conclusory allegation that BMC's sales people were inadequately trained and ineffective with no information regarding how much training and/or experience BMC salespersons had in prior quarters, how BMC's experience and training compared with the industry average, or how these factors affected its revenues. Such information is necessary to show that this "fact," if proven, would show that BMC's public statements were inaccurate.

■ Plaintiffs also assert that BMC had "very significant problems" integrating the sales forces of the acquisitions, that it "had lost the control of its ability to manage" sales forecasting and execution, and that multiple sales people calling on the same customer would lead to "complaints, confusion and refusals to purchase." Yet the amended complaint fails to name even one customer who refused to purchase BMC products or who complained about its sales people. It provides no numbers of customers involved, what kinds of customers were subject to sales contracts, whether those sales contracts related to the same products, or, most significant, how much potential revenue was attributable to affected customers.

The amended complaint further states that the alleged animosity among employees of the acquired entities and those of BMC created high turnover and loss of key personnel. Yet it fails to identify the increase in turnover or any of the sales people who purportedly left the company.

Nor does the complaint indicate how any of these adverse facts came to light, how Defendants leaned about them, or whether Defendants made any statements after learning about them. Simply because BMC subsequently acknowledged sales force difficulties or because analysts later blamed poor sales results in the third quarter of FY00 on these problems does not give rise to an inference that any individual Defendant had forewarning of these problems or their likely effect. "[C]orporate mismanagement does not, standing alone, give rise to a 10b–5 claim, and meas culpa does not sufficiently satisfy the scienter requirements of pleading in securities fraud cases . . . ." *Tuchman v.*

---

**38.** Defendants cite numerous other documents with similar disclosures to rebut allegations of concealment.

*DSC Communications Corp.*, 14 F.3d 1061, 1070 (5th Cir.1994).

■ Similarly, argue Defendants, Plaintiffs' allegations about Defendants' indefinite and vague representations that the demand for BMC products was strong or very strong, despite investors' knowledge that BMC faced competition, awareness of the nationwide fear of the Y2K bug, and awareness that the industry giant, IBM, was facing an uncertain marketplace, should also be dismissed. They are too vague and incomplete to be material or to induce reliance, not to mention being offset by other disclosures. These statements lack the detail necessary to support a fraud claim and raise no inference of fraud.

Nor are Plaintiffs' conclusory allegations about BMC's ability to close large deals actionable. BMC repeatedly disclosed its dependence on large sales transactions and the impact of reduced demand for mainframe capacity on its financial results. Before and during the Class Period, BMC's press releases disclosed its dependence on large enterprise license transactions with customers likely to purchase capacity-related upgrades. Exs. A–17 at 3; A–20 at 2; A–22 at 3; Ex. A–25 at 3; A–28 at 3. It reiterated that "continued demand for significant additional mainframe MIPS capacity" was a significant risk factor affecting operating results. *See* Ex. A–28 at 3. It also persistently admonished that a slowing in demand for large-scale computing power could have negative impact on its financial results. Ex. A–16 at 17; A–27 at 12, 17–18; A–24 at 13, 21; Ex. A–19 at 12–13; A–16 at 17, 28, and many others.

Plaintiffs have asserted that unnamed sales representatives from an unidentified region in January 2000 demanded and had a meeting with director of marketing Bill Kate about their inability to make sales and that Kate then advised them at a meeting not identified by time or place. The minimal detail fails to satisfy the PSLRA. There is no information about how many sales people came to the meeting, whether the meeting concerned individual sales difficulties or company-wide problems, long-term trends or short-term issues, and what effect, if any, the alleged inability to effect sales would have on BMC's revenues. Indeed the vague allegations could refer to a small gathering of two sales people complaining about a temporary lack of product brochures. Nor is there anything but a conclusory statement that the individual Defendants were aware of the meeting. More significant, its lack of even cursory allegations of materiality fails to give rise to an inference that any individual Defendant's public statements were unrealistic or misleading in view of whatever information developed at the January meeting. It is impossible to tell whether any Defendant issued a statement at odds with any information that he might have received at the meeting. Plaintiffs provide no links between the meeting and any allegedly fraudulent statement, or any showing that any statements were misleading.

Furthermore, despite allegations that BMC tried to hide the competitive challenge posed by Computer Associates, BMC regularly disclosed the increasing competition, beginning with a press release in July 1999 and continuing in BMC's third-quarter report and its 10–K for FY00. Exs. A–17 at 3; A–27 at 17–18; A–16 at 9–10. Moreover, the analysts cited by Plaintiffs in their amended complaint discussed the risks posed by competition in their reports. Ex. B–4, B–2. Furthermore, the amended complaint lacks the specific detail required by the PSLRA regarding fraud relating to the effect of competition. Plaintiffs fail to allege how many, if any, BMC customers defected and the effect on BMC or whether any BMC

internal reports support an allegation that Defendants were suppressing the truth about competition.

Defendants also insist the Y2K allegations should be dismissed because BMC repeatedly disclosed the risks associated with these issues and because Plaintiffs fail to allege facts with particularity [39] and to create a strong inference of scienter, as required by the PSLRA. The same is true of allegations that BMC concealed the negative impact on demand for BMC products caused by a slowdown in IBM's mainframe sales and by IBM's decision to introduce a new generation of its mainframe platform. Defendants maintain that BMC frequently advised the market of the important role IBM played in BMC's success, that BMC derived from 64–70% or its revenues from products for IBM-compatible mainframes during this period (Exs. A–30; A–27; A–24; A–19; A–16), that BMC products in essence were improved versions of IBM products that were also subject to displacement (Exs. A–16; A–15; A–7; A–3), and that IBM's technological changes and pricing actions could adversely affect BMC's business (Exs. A–16; A–15; A–7; A–3; A–30; A–27; A–24; A–19; A–14; A–13; A–12; A–10; A–9; A–8; A–6; A–5; A–4). Defendants also contend that Plaintiffs have provided no factual basis for their allegations that BMC had material nonpublic information about IBM's sales or development plans or their purported effect on BMC's sales. Moreover, Defendants note that the danger that troubles at IBM would adversely affect BMC was well known in the market, as was the fact of a slowdown in IBM sales. If anything, Plaintiffs' allegations do not sound in fraud; at best they suggest that BMC mistakenly thought it could overcome IBM's difficulties.

■■■ The amended complaint targets Watson's public statement on November 3, 1999 that he was "comfortable" with the consensus analysts' estimate that BMC would post earnings per share of $.53 in the third quarter. Such statements have been routinely found by courts to be nonactionable puffery because they are soft expressions of optimism and not a guarantee of performance, especially where

---

**39.** Plaintiffs do not identify a single customer, no less the number of customers, who cited Y2K concerns as a basis for delaying software purchases or a single sale that BMC failed to make because of such concerns or how much money was involved in such a sale. They do not even assert that the Y2K-related sales drop-off was material to BMC's sales results in the December quarter leading to the Year 2000. They merely vaguely allege customer "resistance" and "softening" demand. The facts they do assert are so vague that they cannot provide an adequate basis for a fraud claim. They allege that unnamed sales representatives were told by unnamed customers at unspecified times, though "as early as 9/99," that customers would be freezing their mainframe purchases until 2000. They further assert that other unnamed sales representatives told unnamed members of BMC management at unspecified times during the December quarter that the unspecified sales quota for the Quebec, Canada region was too aggressive. There is no indication whether the Quebec sales market is a significant market for BMC or that a shortfall there would affect BMC's revenues overall. Plaintiffs also allege that demand was "so low" that BMC sponsored a July 1999 sales contest in its "desperation" over the "severe slowdown." There is no allegation that the purported sales contest was unusual in timing or terms, nor any indication of how a sales contest during the second quarter of fiscal 2000, a quarter in which BMC met Street expectations, would demonstrate that BMC faced trouble. Defendants contend that such vague "concealed facts" cannot satisfy the PSLRA or Rule 9(b). They further emphasize that Plaintiffs have failed to allege any facts showing that Defendants were aware of these matters, i.e., what they learned and how and when they learned it, and how Plaintiffs know what Defendants learned. They also have not shown with any specificity that any statement made by Defendants was fraudulent at the time it was made.

plaintiffs fail to plead specific adverse information that was available to defendants before the statement was made. *See, e.g., Malone v. Microdyne Corp.,* 26 F.3d 471, 479–80 (4th Cir.1994); *Pacheco v. Cambridge Tech. Partners (Mass.), Inc.,* 85 F.Supp.2d 69, 80–81 (D.Mass.2000); *In re HealthCare Compare Corp. Sec. Litig.,* 75 F.3d 276, 282 (7th Cir.1996). The same is true of statements that BMC's business performance was "better than expected" or the management is "encouraged" or "pleased" with business conditions.

BMC also regularly disclosed in press releases and in quarterly SEC filings the uncertainties in forecasting its sales results because of its dependence on large transactions and the fact that most BMC customers wait until the end of a quarter to make their software purchases. Exs. A–17; A–20; A–22; A–25; A–28; A–16; A–30; A–27; A–24; A–19; A–14; A–13; A–12; A–15; A–10; A–11; A–9; A–8; A–7; A–6; A–5; A–4; A–2. It also disclosed that its stock price was based almost completely on current expectations of sustained future revenue and earnings growth rates and thus its stock value would be negatively impacted by negative forecasts. Exs. A–16; A–30; A–27; A–24; A–19; A–14; A–13; A–12; A–15; A–10; A–11; A–9; A–8; A–7; A–6; A–5; A–4; A–3; A–2.

Plaintiffs have complained that after BMC announced its positive fourth quarter FY2000 results, Defendants misleadingly attempted to assert that BMC's troubles had been temporary and are behind it, and that the company was in much better shape and optimistic. Because BMC again failed to meet analysts' earnings estimates in the first quarter of fiscal 2001, Plaintiffs contend that BMC's optimistic statements after its 4Q00 success were fraudulent, but

fail to allege any facts that would show BMC's statements were fraudulent. Similarly vague expressions of optimism about the future in trying times have been held to be not material, mere puffing, and not actionable under federal securities laws. *In re CompUSA Inc. Sec. Litig.,* Civ. No. 3:94–CV–1151, 1995 WL 811960, *4 (N.D.Tex. Oct.30, 1995); *In re Browning-Ferris Indus. Inc. Sec. Litig.,* 876 F.Supp. 870, 897 (S.D.Tex.1995); *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1219 (1st Cir. 1996). Others see them as forward looking and protected by the PSLRA's safe harbor provision. *Harris v. Ivax Corp.,* 182 F.3d 799, 805 (11th Cir.1999); *Karacand v. Edwards,* 53 F.Supp.2d 1236, 1251–52 (D.Utah 1999).

Plaintiffs also charged that because of its sales force difficulties, BMC had "lost control of … it ability to accurately forecast sales or EPS on a quarterly basis" and that because of its dependence on closing large sales at or near the end of a quarter,[40] BMC knows its forecasted earnings were "unreliable and incorrect." Defendants point to Plaintiffs' failure to plead any specific internal data or information that would even suggest that BMC made public statements based on forecasts they knew to be inaccurate or unreliable.

As for allegations that BMC concealed weaknesses in the European market not due to seasonal factors, sales force integration issues, and problems in maintaining consistent revenue growth in Europe, Defendants point to disclosures of such on a regular basis. Exs. A–16; A–27; A–24; A–19; A–30; A–14; A–13; A–9; A–8; A–7; A–12; A–15; A–10; A–11. They also emphasize the lack of specificity in Plaintiffs' pleadings, in particular allegations as to how weak European revenues were

**40.** See discussion above about BMC's routine disclosures about customary large deals at the ends of quarters. The analysts' reports cited

by Plaintiff reflect that the analysts were aware of BMC's dependence on large deals and the effect of their timing on forecasts.

compared to expectations, links between any European shortfall and the adverse results experienced in the third quarter of fiscal 2000 or the first quarter of fiscal 2001, what non-seasonal factors were responsible for alleged European shortfall.

Defendants insist that even if the amended complaint met pleading requirements, the alleged false and misleading public statements listed by Plaintiffs are too vague to be actionable and are immaterial in light of BMC's substantial public disclosures and publicly-filed documents before the statements were made. They include forward-looking predictions and goals as well as innocuous expressions of optimism. The majority are paraphrased or excerpted from reports of independent stock analysts that BMC did not control. Plaintiffs have pled no facts demonstrating that Defendants exercised control over any of the analysts' comments. *Raab*, 4 F.3d at 288 (Defendants are not responsible for comments of independent analysts that they do not control and have no duty "to police statements made by third parties for inaccuracies, even if the third party attributes the statement" to a Defendant); *In re Stratosphere Corp. Sec. Litig.*, 66 F.Supp.2d 1182, 1199–1200 (holding that Defendants are liable only for analysts' reports they "adopt" by entangling themselves with the report through endorsement or approval thereof); *In re Health Management Sys., Inc. Sec. Litig.*, No. 97 CIV. 1865(HB), 1998 WL 283286, at *5 n. 2 ("To adequately plead 'entanglement,' plaintiffs must specify what information was provided to the analyst, who supplied it, and how defendants may have controlled the contents of the report."); *Fitzer*, 119 F.Supp.2d 12 (finding not actionable statements made by analysts who claimed to have "visited" with defendants when allegations of entanglement were nothing more than general charges that defendants regularly met and provided

guidance to analysts); *Thornton v. Micrografx, Inc.*, 878 F.Supp. 931, 935 & n. 3 (N.D.Tex.1995) (unless analyst's report purports to quote an individual Defendant and provide requisite particulars about statement, it is insufficient as a basis for a securities fraud suit). Because the statements are not actionable, Defendants urge, the amended complaint should be dismissed.

The Court refers the parties to footnote 16 for its conclusions about a company's liability for third-party analyst reports.

██ Defendants object that Plaintiffs rely on statements in sixteen analysts' reports as if they were direct quotations of Defendants' statements. Each is described as based on direct conversations with one of the Defendants, "based on and repeated information" or "pursuant to information and guidance" provided by Watson or Austin. The allegations lack sufficient indicia of reliability, there is no allegation that any Defendant exercised control over an analyst during these alleged conversations, and there is no indication of as to time, place, identity of participants or the contents of the conversations/interviews. *Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1249 (N.D.Cal.1998) ("Since the allegation of entanglement is central to the overall allegation of securities fraud, it must be pled with the degree of specificity required under Rule 9(b). The pleading should (1) identify the specific forecasts and name the insider who adopted them; (2) point to specific interactions between the insider and the analyst which allegedly gave rise to the entanglement; and (3) state the dates on which the acts which allegedly gave rise to the entanglement occurred.").

Moreover, the safe harbor provision of the PSLRA, 15 U.S.C. § 78u–5, protects

Defendants' forward-looking statements about BMC's future business prospects, in press releases, analyst conference calls, analyst reports, and presentations, where they are either "accompanied by a meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements" or are "immaterial." If a forward-looking statement is not accompanied by the requisite cautionary language, the plaintiff must plead sufficient facts to show that the statement was made with "actual knowledge" of its falsity. 15 U.S.C. § 78u–4(b)(2), § 78u–5(c)(1)(B). Defendants insist that all the challenged forward-looking statements were accompanied by cautionary language. For example, the July 29, 1999 press release, Ex. A–17 at 3, included the following specific warnings:

> This news release contains both historical information and forward-looking information. Numerous important factors affect the company's operating results and could cause the company's actual results to differ materially from the results indicated by this press release or by any other forward looking statements made by, or on behalf of, the company, and there can be no assurance that future results will meed expectations, estimates or projections. These factors include, but are not limited to, the following: 1) BMC Software's revenues and earnings are subject to a number of factors, including the significant percentage of quarterly sales typically closed at the end of each quarter, that make estimation of operating results prior to the end of a quarter extremely uncertain; 2) BMC Software's acquisitions of Boole & Babbage, Inc. in March 1999 and New Dimension Software, Ltd. in April 1999 and the high degree of difficulty of integrating different software products and technologies and the general risks associated with mergers of high technology companies, including the potential loss of key personnel and culture conflicts; 3) competition for BMC Software's products is increasing for both the open systems and the mainframe database utility products; 4) international results have been volatile over the last two year; 5) BMC Software continues to increasingly depend on large enterprise license transactions as an integral part of its core mainframe business; 6) the uncertainties of whether new software products and product strategies will be successful; and 7) the additional risks and important factors described in the company's quarterly reports of Form 10–Q and in its Annual Report to Stockholders on Form 10–K for the fiscal year ended March 31, 1999 and other filings with the SEC.

Similarly, argue Defendants, each conference call included cautionary language. As an example, they quote the following statement made by Watson at the beginning of the July 29, 1999 conference call, Ex. A–18 at 2–3.

> I would like to remind you that statements in this discussion regarding BMC's future financial and operating results, the development of and the demand for BMC's products, BMC's operating strategies, anticipated acquisition benefits and other statements that are not statements of historical fact are considered forward-looking statements. Actual results could differ materially from any expectations, estimates, or projections conveyed by these statements, and there certainly can be no assurances that any expectations, estimates, or projections will be met. Past results may not be indicative of future results. I'll remind you that numerous important factors, risks, and uncertainties affect BMC's operating results and could cause

actual results to differ from the results implied by these or any other forward-looking statements. Cautionary statements and BMC's operating results are described in today's press release and our SEC filings.

See also substantially similar language in other conference calls in Ex. A–29 at 23; Ex. A–26 at 2–3; Ex. A–23 at 2–3; Ex. A–21 at 2–3. Examples of meaningful cautionary language in BMC's public filings include Ex. A–30: FY00 10–K at 1, 30–36.

Furthermore, the "bespeaks caution" doctrine, similar to the PSLRA's safe harbor provision, survived the enactment of the PSLRA and protects optimistic projections accompanied by cautionary language containing relevance or assumptions. That doctrine protects BMC's alleged misstatements even where the cautionary language was not contained in the same document as the alleged misstatements where the cautionary language was sufficiently related in time and substance to the purported misstatements.

Moreover, Defendants maintain that Plaintiffs' have failed to plead specific facts demonstrating that Defendants had actual knowledge that any stock analysts' reports and presentations were false.

Finally, Defendants contend that Plaintiffs have not and cannot plead facts demonstrating that Defendants consciously or recklessly made false or misleading statements, but instead try to plead scienter through the motive and opportunity test. The remainder of the motion to dismiss argues the appropriate standard for pleading scienter, regarding which there is a substantial split among appellate courts.

### Scienter: Applicable Law

█ Because the Fifth Circuit has just issued an opinion, *Nathenson et al. v. Zonagen, Inc. et al.,* 267 F.3d 400 (5th Cir. 2001), ruling on the pleading requirements

under the PSLRA for scienter for claims under § 10(b) of the Exchange Act, rather than summarize Defendants' arguments, the Court turns to the Fifth Circuit's decision and the history behind it.

The Fifth Circuit held prior to enactment of the PSLRA in 1995 that "the scienter element of a federal securities fraud claim may be satisfied by proof that the defendant acted with severe recklessness, which is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id., citing Shushany v. Allwaste, Inc.,* 992 F.2d 517, 521 (5th Cir. 1993), *quoting Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961–62 (5th Cir.) (*en banc*), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). *See also McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989) (same); *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir.1977); *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978). In *Nathenson,* 267 F.3d 400, 408–09, the Fifth Circuit concludes that the PSLRA has not altered the substantive scienter requirement and reaffirms its rule that severe recklessness remains a basis for liability and constitutes scienter for purposes of securities fraud cases under section 10(b) and Rule 10b–5.

Although Rule 9(b) allows scienter to be "averred generally," case law requires that "the plaintiff must set forth specific facts that support an inference of fraud." *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir.1994). These specific facts must "make it reasonable to believe that defendant knew that a state-

ment was materially false or misleading." *Id.* The requirement can be satisfied by pleading facts showing a defendant's motive to commit securities fraud or, where the motive is not evident, by the more difficult method of "identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Id.*

The PSLRA, 15 U.S.C. § 78u–4(b)(2), provides:

> In any private action arising under this chapter in which the plaintiff may recover money damages on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

Moreover, if plaintiffs fail to meet this heightened pleading requirement, a court may, on any defendant's motion, dismiss the complaint. 15 U.S.C. § 78u–4(b)(3). The PSLRA does not define what is meant by "the required state of mind." The Circuit Courts of Appeals addressing the question have split into three different positions on the issue.

Like the Fifth Circuit, before the passage of the PSLRA, which eliminated any general pleading of scienter, all the Circuits addressing the issue of scienter have held that some form of recklessness is a sufficient state of mind to state a claim for securities fraud under § 10(b) and Rule 10b–5, but were split as to what facts must be pled to avoid a 12(b)(6) dismissal. *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1281 (11th Cir.1999).

The Second Circuit, prior to the PSLRA required,

> [Plaintiffs must allege facts that give rise to a strong inference of fraudulent intent. "The requisite 'strong inference' of fraud may be established either by (a) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."]

*Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995), *quoting Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). The Second Circuit defined motive and opportunity as follows:

> Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.

*Shields,* 25 F.3d at 1130. The appellate court made clear that motives possessed by nearly all corporate insiders, e.g., wish to uphold a high corporate credit rating, to sustain an image of profitability or successful investment, to insure a high stock price to increase executive compensation, or to prolong the benefits of being a corporate officer, were not sufficient; plaintiffs must plead that the defendants benefitted in a concrete and personal way from the alleged fraud, such as misrepresenting corporate performance or prospects to artificially inflate the price of stock while the corporate insider sold his own shares at a profit. *Novak v. Kasaks,* 216 F.3d 300, 307–08 (2d Cir.2000), *cert. denied,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000). If plaintiffs chose to plead facts that constituted strong circumstantial evidence of conscious misbehavior or recklessness by defendants, "intentional misconduct" is conduct that "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information ... or

knowing sale of a company's stock at an unwarranted discount." *Id.* at 308.

After passage of the PSLRA, the Second and Third Circuits [41] concluded that the PSLRA, in essence, adopts the first portion and expressly tracks the second part of the Second Circuit's test, thus codifying the Second Circuit's pre-PSLRA case law permitting plaintiffs to plead intent by alleging facts showing either (1) that defendants had both motive and opportunity to commit fraud or (2) that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168–69 (2d Cir.2000); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534–35 (3d Cir.1999); *Oran v. Stafford,* 226 F.3d 275, 288 (3d Cir.2000). The Second Circuit, aware of Congress' failure to include language about motive and opportunity in the PSLRA, has minimally modified its test by stating that the court "need not be wedded to these concepts in articulating the prevailing standard" for pleading scienter. *Novak,* 216 F.3d at 310. A bare invocation of these "magic words" is insufficient; only facts regarding the particular circumstances will make "motive and opportunity probative of a strong inference of scienter." *Id.* at 311. Thus, according to the

Second Circuit, a strong inference of fraudulent intent "may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud . . .; (2) engaged in deliberately illegal behavior . . .; (3) knew facts or had access to information suggesting that their public statements were not accurate . . .; or (4) failed to check information that they had a duty to monitor . . . ." *Id.* Furthermore, the Second Circuit has at times permitted allegations of simple or non-deliberate recklessness to satisfy the scienter standard where the defendant had a duty to monitor certain information and failed to do so. *Novak,* 216 F.3d at 308–09.

At the other end of the spectrum, the Ninth Circuit has concluded that the PSLRA substantively changed the level of scienter and required a higher, or more demanding, pleading standard than the Second Circuit's. The Ninth Circuit has rejected the motive and opportunity test in favor of pleading "facts that come closer to demonstrating intent," and has refused to adopt the strong inference standard for simple recklessness, insisting that the PSLRA has substantively enhanced the scienter requirement to, at minimum, "deliberate recklessness." [42] *In re Silicon*

---

**41.** These appellate courts concluded that because Congress specifically incorporated the Second Circuit's "strong inference" language into § 78u–4(b)(2), the PSLRA sets out a pleading standard equal to that of the Second Circuit and reflects an intent to import the judicial interpretations of that language. *Novak v. Kasaks,* 216 F.3d at 310. Citing the legislative history, the Second Circuit concluded that Congress chose its pre-PSLRA standard because it was "the most stringent in the nation." *Id.,* citing H.R. Conf. Rep. No. 104–369 at 41. Although conceding that the legislative history of the PSLRA contains "conflicting expressions of legislative intent" regarding the pleading standard, the Second Circuit points out that the Senate Committee reporting the bill stated that it was proposing

not "a new and untested pleading standard that would generate additional litigation," but rather "a uniform standard modeled upon the pleading standard of the Second Circuit." *Id.* at 311, *citing* S.Rep. No. 104–98, at 15 (1995), *reprinted in* 1995 U.S.C.A.A.N. 679, 694 (noting that courts interpreting proposed "strong inference" standard might find Second Circuit case law "instructive.").

**42.** Adopting the Seventh Circuit's definition, the Ninth Circuit defines "deliberate recklessness" as a "form of intentional or knowing misconduct" in much the same way as the courts of appeal discussed above: "[R]eckless conduct [is defined as] . . . a highly unreasonable omission, involving not merely simple, or even unexcusable negligence, but an extreme

*Graphics, Inc.*, 183 F.3d 970, 974 (9th Cir. 1999). The Ninth Circuit views the PSLRA as expressly adopting only the Second Circuit's "strong inference standard" and as expressly refusing to codify the Second Circuit's case law and motive and opportunity test. *Id.* Moreover, it reads the statute's factual particularity requirement as mandating that the plaintiffs "provide a list of all relevant circumstances in great detail." *Id.* at 984. For instance, if a report is the alleged source of the defendants' actual or constructive knowledge, plaintiffs must provide at least some specific "adequate corroborating details," e.g., the sources of plaintiffs' information about the report, how plaintiffs learned of it, who drafted it, which officers received it, and a description of its contents. *Id.* at 985. Regarding insider stock trading and pleading sufficient facts to give rise to a strong inference of scienter (deliberate recklessness), the Ninth Circuit states that insider trading "is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Id.* at 986, *quoting In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989). A district court needs to consider (1) the amount and percentage of shares sold by insiders, (2) the timing of the sales, and (3) whether the sales were consistent with the insider's prior trading history. *Id.* In determining whether the sale was unusual or suspicious, it should examine the proportion of shares actually sold by the insider to the volume of shares he could have sold. *Id.* Furthermore, the Ninth Circuit does not accept as sufficient for establishing scienter the pleading, by itself, of the temporal proximity of an allegedly false optimistic

statement and a subsequent disclosure. *Yourish v. California Amplifier*, 191 F.3d 983, 997 (9th Cir.1999).

In the middle, between the Second and Ninth Circuits' pleading standards under the PSLRA, the Eleventh, Sixth and First Circuits also reject the Second Circuit's relatively easily met motive and opportunity pleading standard, standing alone, which they also maintain that the PSLRA did not codify, as sufficient to plead scienter unless the facts pled regarding motive and opportunity demonstrate that the defendants acted recklessly or knowingly. *Bryant*, 187 F.3d at 1283; *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 551 (6th Cir.1999); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197 (1st Cir.1999). They hold that the operative language of the PSLRA, i.e., that a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with *the required state of mind* [emphasis added]," upholds the established judicial rule of which Congress was well aware that the pleading of specific facts denoting severe recklessness is sufficient to state a claim. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 550–51 (6th Cir.2001) (*en banc*) (conclusory labels by plaintiff of motive and opportunity insufficient; court must examine the factual substance of the complaint to determine if facts give rise to a strong inference of recklessness, i.e., "highly unreasonable conduct which is an extreme departure from the standards of ordinary care"); *Bryant*, 187 F.3d at 1283. For these Circuits, scienter "encompass[es] at least a showing of severe recklessness"; thus the PSLRA did not substantively change the actionable level of scienter. *Id.* at 1286; *Greebel*, 194 F.3d at 199–200,

---

departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Silicon*, 183 F.3d at 976.

201.[43] The First Circuit has held that "inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences." *Greebel*, 194 F.3d at 195. In support of their conclusions, the Sixth and First Circuits emphasize, in contrast, the express requirement for a scienter of "actual knowledge" that a forward-looking statement was false or misleading as the standard necessary to defeat the safe harbor defense of a defendant under 15 U.S.C. § 78u–5(c)(1)(B), instead of the inferred scienter of recklessness with respect to securities fraud claims under § 10(b) and Rule 10b–5. *Bryant*, 187 F.3d at 1286; *Greebel*, 194 F.3d at 201. The Sixth Circuit stated, "To the extent that the effort in [the Ninth Circuit's] *Silicon Graphics* is an attempt to import into the law a new and uncertain super-recklessness, *see* 183 F.3d at 550 ('deliberate or conscious recklessness'; 'degree of recklessness that strongly suggests actual intent'), we believe that the intent is inconsistent with the plain statutory language." *Bryant*, 187 F.3d at 1286.

The First Circuit, moreover, has indicated that because a strong inference of scienter, rather than merely a reasonable inference, is now required to survive a motion to dismiss, evidence of mere motive and opportunity to commit fraud would not be sufficient unless it rose to the level of creating a strong inference of reckless or knowing conduct. *Greebel*, 194 F.3d at 196–97. Thus standing alone, a single characteristic fact pattern, such as one of the following examples, would not constitute pleading sufficient to raise a strong inference of scienter: insider trading; divergence between internal reports and external statements on the same subject; proximity of an allegedly fraudulent statement or omission and a later disclosure of inconsistent information; evidence of bribery by a top official; existence of an ancillary lawsuit charging fraud by a company and that company's quick settlement of the suit; disregard of the most current factual information before making statements; disclosure of accounting information in a manner that would conceal its negative

---

**43.** Portions of the legislative history support their rejection of the motive and opportunity test, as discussed in detail by the First Circuit in *Greebel*, 194 F.3d at 194–96 and summarized by this Court as follows. Congress stated, "The Conference Committee language is based in part on the pleading standard of the Second Circuit" and that "[b]ecause the Conference Committee intends to strengthen the existing pleading standards, it does not intend to codify the Second Circuit's case law interpreting this pleading standard." H.R. Conf. Rep. 104–369, at 41 (1995), reprinted in 1995 U.S.C.A.A.N. 730, 740. An added footnote states, "For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity or recklessness." *Id.* at 41, n. 23, reprinted in 1995 U.S.C.A.A.N. at 747. Furthermore, although the Senate bill (S. 240) contained an amendment that would have codified the Second Circuit law, the Conference Committee deleted it. Amend. 1485, S. 240, 104th Cong., 1st Sess. (1995). In addi-

tion, President Clinton, who vetoed the bill, but was later overridden by Congress, stated that through the PSLRA Congress "intended to 'strengthen' the existing pleading requirements of the Second Circuit ... [and] to erect a higher barrier to bringing suit than any now existing[.]" H.R. Doc. No. 104–150 (104th Cong., 1st Sess. (1995), 141 Cong. Rec. H15214 (Dec. 20, 1995)).

The First Circuit has conceded that "[t]he legislative history is inconclusive on whether the Act was meant to either embody or to reject the Second Circuit's pleading standards." *Greebel*, 194 F.3d at 195, *citing* the Third Circuit's *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531–33 (3d Cir.1999) (ignoring legislative history because of contradictions and lack of clarity). The First Circuit concludes, "At best, there appears to have been an agreement to disagree on the issue of Second Circuit standards (other than the strong inference standard), and perhaps, as is common, to leave such matters for the Courts to resolve." *Greebel*, 194 F.3d at 195.

implications except to a highly sophisticated person; the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and the self-interested motivation of defendants in saving their salaries or jobs. *Greebel,* 194 F.3d at 196; endorsed by Sixth Circuit in *Helwig,* 251 F.3d at 552. Instead, under the PSLRA, a court must examine the particular facts of each individual case to see whether they support a strong inference of scienter or reckless and knowing conduct, not merely a reasonable inference, to survive a motion to dismiss. *Id.* at 196–97. In a statement relevant to the instant case, the First Circuit notes that "[u]nusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter." *Id.* at 197, *citing inter alia Rubinstein,* 20 F.3d at 169–70. Nevertheless, it cautions that "mere pleading of insider trading, without regard to context or strength of inferences to be drawn, is not enough. . . . At a minimum, the trading must be in a context where defendants have incentives to withhold material, nonpublic information, and it must be unusual, well beyond the normal patterns of trading by those defendants." *Id.* at 198.

Even in pre-PSLRA cases of securities fraud, in applying Rule 9(b) scienter requirements established by case law, the Fifth Circuit made clear that alleging that the defendants engaged in fraud in order to inflate a company's common stock for a successful offering or to protect and enhance their executive positions, and the substantial compensation and prestige attending their official roles, or enhancing the value of their personal company holdings and options is not sufficient to support the requisite inference of scienter. *Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir. 1994); *Tuchman,* 14 F.3d at 1068–69. Indeed, the *Melder* panel observed, "Accept-ing the plaintiffs' allegation of motive—basically that the defendant officers and directors were motivated by incentive compensation—would effectively eliminate the state of mind requirements as to all corporate officers and defendants." Rather, plaintiffs must identify specific corporate defendants that actually personally profited from allegedly inflated stock values, with particular facts upon which a inference of conscious behavior can rest. *Melder,* 27 F.3d at 1102–03. Mere conclusory allegations that the defendants, because of their membership and/or their executive and managerial positions with the defendant company, knew or had access to information that was adverse and nonpublic do not plead scienter adequately. *Id.* at 1103.

In its just issued opinion, *Nathenson,* 267 F.3d 400, 410–11 [citations omitted], noting agreement in *Bryant* by the Eleventh Circuit and in *Greebel* by the First Circuit, the Fifth Circuit states,

> The most sensible approach to us to be the one first generally articulated by the Sixth Circuit in *Comshare.* The *Comshare* Court held that scienter can be alleged by pleading facts giving rise to a strong inference of recklessness or conscious misconduct, but declined to hold that allegations of motive and opportunity, "standing alone," meet the pleading requirement. . . . Instead, the Court stated that motive and opportunity could be "relevant" to pleading scienter and "may on occasion rise to the level of creating a strong inference of reckless or knowing conduct."

Later, the appellate court stated, "Appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter, but it would seem to be a rare set of circumstances indeed where those allegations alone are both sufficiently persuasive to give rise to

a scienter inference of the necessary strength and yet at the same time there is no basis for further allegations also supportive of that inference." *Id.* at 412. The panel noted, *id.* at 410–11 [citations omitted],

> The PSLRA neither mandated nor prohibited *any* particular method of establishing a strong inference of scienter... The only special standard that Congress established was raising the pleading requirement to a "strong" inference of scienter. This standard may only be met on the basis of "facts" which are "state[d] with particularity" in the pleading. By otherwise leaving open the manner in which a plaintiff may raise a strong inference of scienter, and not codifying the motive and opportunity method, Congress may be presumed to have to some extent left the matter to the courts.

The appellate court further suggests, "The probative force of facts alleged ultimately depends on reason and experience, and in this respect guidance can properly be afforded by prior judicial decisions." *Id.* at 412.

Thus facts suggesting motive and opportunity, while nearly always not sufficient by themselves, are factors that may be weighed in determining whether scienter exists.

The Fifth Circuit also underlined that the statute mandates that a plaintiff identify specifically the alleged misrepresentations and/or misleading omissions and that "[t]he effect of the PSLRA ... *at a minimum,* incorporates the standard for pleading fraud under Fed.R.Civ.P. 9(b)." *Id.* at 412.

### Scienter and Insider Trading

A conclusory statement of insider trading is insufficient to give rise to a strong inference of scienter; Plaintiffs must delineate unusual trading at suspicious times and in suspicious amounts by corporate insiders, out of line with prior trading practices, for such conduct to be probative of scienter. *Rubinstein,* 20 F.3d at 169–70; *Shaw,* 82 F.3d at 1204; *Greebel,* 194 F.3d at 197–98, 206; *Silicon Graphics,* 183 F.3d at 986.

■ Defendants' motion to dismiss argues that the stock sales of Watson and Austin are neither suspicious nor unusual. BMC executives could not sell stock from March 1, 1999 until July 29, 1999 under SEC guidelines because of the acquisition of Boole & Babbage.[44] Specifically, Watson, who held 3,539,180 shares and vested options during the Class Period, sold only ten percent of his stock, especially in light of the prohibition on sales for four months March–June 1999. During the analogous period in 1997 he sold seven percent, in 1998 he sold thirteen percent, in 1999 he sold five percent, and in 2000 he sold ten percent. Furthermore, during the Class Period Watson held 730,180 BMC shares and more than 2,000,000 vested options with an exercise price substantially below market price, even though BMC stock traded at an all time high during the Class period, evidence that he never engaged in any scheme to deceive the public. *Burlington Coat Factory,* 114 F.3d at 1426.

■ Austin's trading history is too limited to give rise to an inference of intent to defraud. *In re Silicon Graphics,* 183 F.3d at 987 (stock sales cannot be viewed as "unusual" where defendant "ha[s] no significant trading history for purposes of

---

44. Thus the preceding analogous period (July 29, 1998–July 5, 2000) is shortened by four months and August 1999 was the first month since February 1999 when BMC executives could trade their BMC stock.

comparison"). As reflected in BMC's 1999 proxy statement filed with the SEC on October 1, 1999, Austin was first employed by BMC in 1996 and did not have any vested options until 1998. During the Class Period, he sold only twenty-two percent of his stock and vested options, which constituted considerably smaller holdings than those of other Defendants. Ex. D–5. *In re FVC.COM Sec. Litig.*, 136 F.Supp.2d 1031, 1038–40 (N.D.Cal.2000) (sales of twenty-nine percent by one defendant and thirty percent by another are "insufficient to support an inference of scienter"); *Wenger v. Lumisys, Inc.*, 2 F.Supp.2d at 1238 n. 6, 1251 (sales of twenty-six percent, thirty-eight percent, twenty-five percent, and thirty-two percent held not suspicious). Moreover from July 29, 1998 to July 5, 1999, Austin exercised seventeen percent of his options, as compared with twenty-two percent during the Class Period, an insufficient basis for finding a strong inference of intent to defraud or for finding trading amounts to be "unusual."

▮▮▮▮ Plaintiffs have alleged that Defendants collectively had motive and op-portunity to perpetrate their fraudulent scheme based on their sale of a collective total of 1,364,215 shares of BMC stock during the Class Period. Because the amended complaint specifically alleges that only Watson and Austin made misstatements or participated in the alleged scheme to defraud, the state of mind of the other Defendants is irrelevant. *In re CIGNA Corp. Sec. Litig.*, 99 F.Supp.2d 650, 663 n. 11 (D.Md.2000)(finding "that the sales of stock made by non-speaking defendants are insufficient to give rise to an inference of fraud"); *In re Scholastic Corp. Sec. Litig.*, 2000 WL 91939, *13 (S.D.N.Y. Jan. 27, 2000) (stock sales of eighty percent of holdings by executive that did not make any alleged misstatements did not establish scienter); *Head v. NetManage, Inc.*, 1998 WL 917794, *5 (N.D.Cal. Dec. 30, 1998)(executives' sales of 76 percent and 94 percent held "insufficient to create the requisite strong inference of scienter in light of the lack of any specific allegations as to their fraudulent conduct, including the lack of any allegation that they personally made any of the fraudulent statements").[45]

**45.** The Court notes that under the traditional "group pleading presumption," a company's statements "in prospectuses, registration statements, annual reports, press releases, or other group-published information" may be presumed to be the collective work of those individuals with direct involvement in the everyday business of the company. *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999). Thus if the group pleading doctrine applies, the plaintiff is relieved of his Rule 9(b) and/or PSLRA burden of attributing statements to a particular defendant with scienter, but the plaintiff must still plead both the circumstances of the alleged misleading statements and of the falsity with particularity. *Splash*, 2000 WL 1727377, *25. No Circuit court has addressed the question of whether the doctrine survived the enactment of the PSLRA with its particularity in pleading requirements.

The district courts that have considered the question are of divergent views. Courts con-cluding that the group pleading presumption is no longer viable after the passage of the PSLRA include *Coates v. Heartland Wireless Communications, Inc.*, 26 F.Supp.2d 910, 916 (N.D.Tex.1998) (since PSLRA requires plaintiffs to set forth facts raising a strong inference that each defendant acted with the required state of mind, group pleading is inconsistent with 15 U.S.C. § 78u–4(b)(2), as well as contrary to its underlying policy of protecting defendants from unwarranted claims and strike suits); *Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1350 (S.D.Cal. 1998)(the "judicial presumption" of group pleading could not "be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each act or omission by the defendant"); *Marra v. Tel–Save Holdings, Inc.*, 1999 WL 317103, *5 (E.D.Pa.1999)("the presumption inherent in group pleading is inconsistent with the PSLRA's purpose ... since the PSLRA specifically requires that the untrue statements or omissions be set forth

Defendants also point out that Defendants Weiss, Wilson and Morris have no publicly documented trading history because they did not become executive officers until just before the Class Period.

In addition, Defendants insist that the timing and sales of Defendants' sales are not suspicious and fail to give rise to any strong inference of scienter. Public disclosure documents reflect that with the exception of only one sale of stock in December 1992, long before the Class Period, no Defendant sold BMC stock during the first twenty days of any quarter or during the last month of any quarter. Furthermore, to the extent that any individual Defendant sold some of his BMC holdings, he generally did so well before or well after any of the earnings announcements targeted by Plaintiffs in their amended complaint. Nor is there any pattern of large trades before negative earnings announcements or other similar disclosures. Defendants go through a detailed analysis to support these points. Motion to Dismiss at 79–87.

**Plaintiffs' Memorandum In Opposition (# 79)**

After repeating the allegations of the amended complaint, Plaintiffs insist they have met the particularity requirements of Rule 9(b) and the PSLRA by identifying the misleading statements, the circumstances under which they were made, and contemporaneous facts to explain why they were false and misleading. They note that the Court must consider the allegations of the complaint as a whole and emphasize that they are not required to prove their case at this stage.

Plaintiffs also maintain that they have adequately demonstrated how Defendants' statements were misleading by detailing specific problems facing BMC at the times when they were issued. For example, Defendants repeatedly claimed throughout the Class Period that there was a strong demand for BMC mainframe MIPS software and that its mainframe business remained "very strong" and "very profitable" when there was actually a drastic slowdown in such purchases. They reiterate the facts they allege were known to Defendants that indicated the slowdown, including the following: (1) resistance from customers because of Y2K concerns to postpone such purchases until after the new year, which was communicated to rep-

with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind' "; also PSLRA now "allows plaintiffs to plead upon 'information and belief' that a statement is misleading provided that the Complaint states with particularity all facts on which this belief is formed"). Holding that the group pleading doctrine survived the PSLRA are *inter alia In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999) ("the PSLRA has not altered the group pleading doctrine"); *In re Miller Industries, Inc. Sec. Litig.*, 12 F.Supp.2d 1323, 1329 (N.D.Ga. 1998); *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1108 (D.Nev.1998); *In re BankAmerica Corp. Sec. Litig.*, 78 F.Supp.2d 976, 988 (E.D.Mo.1999)(group pleading doctrine "has nothing to do with scienter," is "a rebuttable presumption applicable only to a limited group of persons within the company [officers and directors with inside knowledge of and involvement in the day-to-day affairs of the company]," and "is not inconsistent with the PSLRA"); *Baan Co. Sec. Litig.*, 103 F.Supp.2d 1, 17 (D.D.C.2000). Somewhere in between is *McNamara v. Bre–X Minerals Ltd.*, 57 F.Supp.2d 396, 427 (E.D.Tex.1999) ("Plaintiffs have relied too heavily on the group pleading presumption. More particularization is required .... Plaintiffs should, when possible, avoid attributing actions to ... Defendants collectively. When not possible the Plaintiffs should offer an explanation as to why this is the case."). Because this Court believes a more stringent pleading is required by the PSLRA, it agrees with those district courts that find the group pleading doctrine is at odds with the PSLRA and has not survived the amendments.

resentatives as early as September 1999; (2) failure of the Quebec, Canada sales region to reach sales quotas and reports from sales representatives to management stating that it had unsupportable expectations for that region, which information led BMC to initiate a marketing contest, aptly called "Operation Lifeboat"; (3) regular communications between Defendants and IBM regarding IBM's mainframe/MIPS sales slowdown, which would necessarily negatively affect demand for BMC's products; (4) anticipation of new versions of IBM's mainframe, while customers had purchased extra MIPS for Y2K testing and had no need to purchase more; (5) problems in closing big-ticket or large sales, which were essential for BMC because of its inadequately trained and ineffective sales personnel, increased competition from Computer Associates, and Y2K concerns that made its ability to achieve its forecasted EPS doubtful; and (6) concealing problems and artificially inflating revenues and EPS by inducing customers to accept large software purchases while giving them extended payment terms or other side agreements delaying or forgiving payment under specified circumstances.

Plaintiffs also highlight the short time between Defendants' positive statements and their disclosure of the problems plaguing BMC as an indication of the falsity of Defendants' representations. For instance, in December 1999 Defendants told investors that BMC was ahead of expectations for the quarter, that Europe's situation was improving, that large deals looked strong, and that conditions at BMC remained positive. One analyst reported Defendants were "comfortable" with earnings estimates. Three weeks later, on January 5, 2000, Defendants disclosed that the quarter results would be much worse than expected because of problems with BMC's sales force, the lack of large deals,

and serious weakness in European operations. Similarly in June 2000 they stated that earnings estimates were on target of a quarter to end in eleven days. Weeks later, they announced that BMC's earnings would not meet the estimated $.46, but would be between $.18–$.21 and that revenues would be less than half of estimates made days before.

Plaintiffs also argue that statements made by Defendants, such as the following, are more than mere puffery because they misled investors: that integration of newly acquired Boole & Babbage and New Dimension was proceeding well and would not interfere with BMC's achieving forecasted results; that business was performing better than expected and that BMC enjoyed strong demand for its mainframe software; that BMC had a stellar quarter with very strong demand for its core products; that Defendants were comfortable with analysts' earnings expectations five weeks prior to the end of a quarter; that Defendants had overcome problems that caused poor results in the previous quarter and announced BMC was "in so much better shape" with the worst behind.

Plaintiffs contend that statements about the company's performance and prospects, the demand for its products, and its ability to overcome problems causing previous earnings shortfalls are clearly important to investors. The fact that Defendants traded on BMC stock following their misstatements indicates materiality. Furthermore, the fact that the value of BMC stock plummeted after Defendants disclosed the truth also shows that their false and misleading statements were material and not merely vague optimism.

Plaintiffs further argue that Defendants Gardner, Beauchamp, Morse, Weiss, Wilson, Morris, Van Duyn, Klausmeyer and Solcher are liable for the false and mis-

leading statements because Plaintiffs have specifically pled how they participated in the scheme to defraud under the group published doctrine and by insider trading of their stocks. "Primary liability may be imposed 'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.'" *SEC v. First Jersey Sec.*, 101 F.3d 1450, 1471 (2d Cir.1996), *quoting Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994). Insider trading on material nonpublic information qualifies as a "deceptive device" under § 10(b). *United States v. O'Hagan*, 521 U.S. 642, 651, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). It also violates the rule that an individual corporate insider in possession of material nonpublic information is barred by securities laws from trading on that information unless he' makes public disclosure of that information, or the "abstain or disclose" doctrine. Plaintiffs then again list the name, position at BMC, the number of shares he sold, and amount of his proceeds from the sale for each individual Defendant.

In response to Defendants' contention that the market knew of the facts Plaintiffs allege, Plaintiffs insist that the fact-intensive truth-on-the-market defense [46] is rare-

---

**46.** In *Fine v. American Solar King Corp.*, 919 F.2d 290, 298 (5th Cir.1990), *cert. dismissed sub nom. Main Hurdman v. Fine*, 502 U.S. 976, 112 S.Ct. 576, 116 L.Ed.2d 601 (1991), the Fifth Circuit explained the theory of "fraud on the market," which creates in a Rule 10b–5 securities fraud action a rebuttable presumption of constructive reliance by the plaintiffs on alleged misrepresentations, whether or not they have actually heard or seen the statements:

> Under the fraud on the market theory, ... misleading statements defraud purchasers of stock even if the purchasers do not rely directly on such misstatements.... The Supreme Court in *Basic[, Inc. v. Levinson]*, 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) observed:
>
> > The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. *Id.* ...
>
> The court presumes that the plaintiff relied not on the defendant's fraudulent statements directly, but on the market's reflection of those fraudulent statements in the value of the stock. [Most citations omitted] *Id.* The Fifth Circuit has reasoned, "An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price,

an investor's reliance on any public material misrepresentation, therefore may be presumed for purposes of a Rule 10b–5 action." *Id.* at 299, 108 S.Ct. 978. The theory

> assumes that prices in an efficient market incorporate the relative importance of public information, whether that information is true or false. If publicly announced information regarding a security is fraudulent, a subsequent purchaser of that security from the market is said to have constructively relied on the fraudulent statements because they were incorporated into the market price. The case proceeds despite the fact that the defendant and the purchaser had no direct relationship and reliance upon the false statements could not be shown. This is because under the theory, the market as an efficient translator of data to price acted as an intermediary, connecting plaintiff and defendant.

*Summit Properties, Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556, 561 (5th Cir.2000), *cert. denied*, 531 U.S. 1132, 121 S.Ct. 896, 148 L.Ed.2d 802 (2001).

Thus the plaintiffs' burden on causation is to allege facts that show defendants' omissions and misrepresentations caused artificial inflation of the market price of the stock so that it appeared to be a good investment, with the end result being that when the truth about the company's condition was finally disclosed, the stock lost value and the plaintiff suffered a loss. *Zuckerman v. Foxmeyer Health Corp.*, 4 F.Supp.2d 618, 626 (N.D.Tex.1998).

The defendants can then rebut presumption of reliance by demonstrating "(1) that the

ly appropriate for dismissal of a § 10(b) complaint for failure to plead materiality. *In re Apple Computer Sec. Litig.*, 886 F.2d at 1116; *Ganino*, 228 F.3d at 167. To establish such a defense, a defendant must show that the material negative information that he did not disclose was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations." *Apple*, 886 F.2d at 1116. Moreover here there is a dispute in interpretation of the facts.

Specifically Plaintiffs contend that Defendants did not adequately disclose problems of which they knew in integrating the sales forces of the new acquisitions with that of BMC and in the integrated sales force's failure to close sales and large transactions. They claim that Defendants' "disclosures" are mere boilerplate warnings that do not directly relate to the alleged false and misleading statements. They point to examples such as the statement that the integration of sales forces is more challenging than the technical integration of the companies or that there is "no assurance" that the integration efforts will be successful, which fails "to inform investors of the crippling ongoing chaos undermining BMC's sales execution process, which Defendants knew of even as they made their glowing statements."

Memorandum at 30. *See Rubinstein*, 20 F.3d at 171 ("the inclusion of general cautionary language regarding a prediction [does] not excuse the alleged failure to reveal known material, adverse facts."). Plaintiffs insist that Defendants' warnings fail to provide " 'enough cautionary language or risk disclosure' that 'reasonable minds' could not disagree that the challenged statements were not misleading." *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir.1995), *cert. denied*, 517 U.S. 1136, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996).

Plaintiffs also urge that disclosure of BMC's integration problems to analysis did not reveal "the devastating impact the disjointed sales force had on BMC's ability to execute sales" or "that the sales force integration debacle infected North America as well as Europe." Memorandum at 30–31. Plaintiffs claim the warnings about potential loss of employees because of the acquisitions are "unquestionably boilerplate" that was "repeated almost verbatim in BMC's SEC fillings over the course of more than one year" and in its press releases from July 1999—January 2000. *Id.* at 31. Similarly they contend that Defendants did not disclose their specific knowledge that demand for BMC's MIPS/mainframe was substantially declining and that it could not close the large transactions on which it depended. The boilerplate warnings repeated verbatim in press releases

nondisclosures did not affect the market price, or (2) that the Plaintiffs would have purchased the stock at the same price had they known the information was not disclosed; or (3) that the Plaintiffs actually knew the information that was not disclosed to the market." *Fine*, 919 F.2d at 299.

The "truth-on-the-market" doctrine is a corollary to the "fraud on the market" and stands for the proposition that a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market. *Ganino*, 228 F.3d at 167; *Provenz v.*

*Miller*, 102 F.3d 1478, 1491 (9th Cir.1996). The truth-on-the-market doctrine can be used as a defense by a defendant to rebut the presumption that its misrepresentations have affected the price of the company's stock by showing that the truth of the matter was already known, provided that "the corrective information [was] conveyed to the public 'with a degree of intensity and credibility' sufficient to counterbalance effectively any misleading information created by" the allegedly false and misleading statements. *Ganino*, 228 F.3d at 167, *quoting Apple Computer*, 886 F.2d at 1116.

do not make Defendants' specific assurances immaterial. Nor do boilerplate warnings given months if not years before the Class Period. The same is true of the boilerplate Y2K warnings. Defendants warned only that customers may choose to defer purchases; Plaintiffs have alleged, and Defendants did not disclose, that BMC actually heard repeatedly from customers that they would defer purchases for that very reason. Plaintiffs also are not alleging that Defendants concealed a "potential 1999 purchase 'lockdown' and the possibility of delaying or foregoing large purchases," but that Defendants concealed known, existing problems in selling mainframe MIPS software as early as July 1999 and difficulties in closing large sales. Similarly, that BMC disclosed that it could face risks if IBM had difficulties does not render immaterial Defendants' statements that they were not experiencing any risks even though there was a slowdown at IBM. Defendants' arguments that its surprisingly positive 2QF00 results were the result of reclassifying certain legal expenses as non-recurring and drawing down deferred revenues, Plaintiffs assert, are not credible and did not persuade the analysts. Defendants actually attributed the strong showing to the strength of BMC's flagship PATROL products. Since that analysts did not identify the divergence, the truth was not revealed to the investing public in a way that "credibly entered the market and dissipated the effects of the misstatements." *Basic*, 485 U.S. at 249, 108 S.Ct. 978.

Defendants' "glowing statements" about specific aspects of BMC's business such as that demand for BMC's products was not declining despite Y2K concerns or despite slowing in mainframe product sales or even statements of comfort with analysts' estimates [47] are actionable, insist Plaintiffs.

**47.** Plaintiffs argue that Defendants' "generic purported disclosures regarding the uncertainty of estimating operation results do not render their statements inactionable is unpersuasive in light of the fact that Defendants knew of 'numerous crippling problems at BMC' when they expressed comfort with the analysts' forecasted earnings estimates of $.46 [per share] and in light of the huge gap between the forecasted results with which defendants expressed comfort and the actual results [between $.18–.21 and less than half the forecasted revenues] for the quarter ending only [eleven] days later." Memorandum at 35.

Plaintiffs cite as authority *Rubinstein*, 20 F.3d at 168–69 (finding company's characterization of analyst's statement as "realistic" to be actionable); *In re Gupta Corp. Sec. Litig.*, 900 F.Supp. 1217, 1235 (N.D.Cal.1994)(statement that defendant was "comfortable with Wall Street estimates that the company would earn 41 cents a share" held actionable but statement that predictions were "within reason" was not actionable); *In re Adobe Sys., Inc. Sec. Litig.*, 787 F.Supp. 912, 916–18 (N.D.Cal.1992)(expressions of "comfort" with earnings estimates may be actionable where supported, *inter alia* by evidence that the esti-

mates were false or misleading), *affirmed sub nom. Cloutier v. Adobe Systems, Inc. Sec. Litig.*, 5 F.3d 535 (9th Cir.1993); *Schaffer v. Timberland Co.*, 924 F.Supp. 1298, 1314 (D.N.H.1996)("as a general matter, defendants' statements of comfort with or their adoption or ratification of an analyst's projections may be actionable where the statements are sufficiently specific and accompanied by evidence suggesting that the defendants knew or should have known that the statement was false and misleading, i.e., evidence of scienter").

This Court observes that there is a split among courts ruling on the issue of whether statements by public company executives expressing comfort with analysts' revenue and earnings estimates are actionable under the securities laws, with most dismissing vaguely pleaded claims. The Fourth Circuit has repeatedly said these comfort statements are not actionable unless they constitute guarantees of future business performance or are sufficiently specific to constitute fraud on the market. *Malone v. Microdyne*, 26 F.3d 471, 479 (4th Cir.1994)(statements of comfort with analysts' projections are actionable "only if they are supported by specific statements of

Memorandum at 34. Plaintiffs further charge that the cautionary language cited by Defendants is spread out across five volumes of exhibits and is therefore insufficient to protect them against misleading statements. *Copperstone v. TCSI Corp.,* No. C 97–3495 SBA, 1999 WL 33295869, at *13, 1999 U.S. Dist. LEXIS 10978, at *43 (N.D. Cal. Jan. 19, 1999) ("cautionary language spread out among various documents is insufficient to protect misleading oral statements under the 'bespeaks caution' doctrine"); *In re Hi/fn Inc. Sec. Litig.,* No. C 99–4531 SI, 2000 U.S. Dist. LEXIS 11631, at *15 ("Misleading oral statements are not protected by cautionary language 'spread out among various documents' ").

In light of the severity of BMC's problems of which Defendants were allegedly aware, Plaintiffs disagree with Defendants' characterization of various statements as mere vague expressions of optimism, such as the following: (1) that there was "no slowing in mainframe capacity demand"

and that if such occurred, new business would pick up the slack; (2) eleven days before the end of a quarter they told analysts that several $10 million deals had already closed and they were still comfortable with analyst estimates of $.45 per share; (3) that BMC's Y2K problems were behind it; and (4) Watson's statements on April 25, 2000 that he expected margin improvement and growth of new business segments, including MIPS growth, while Austin stated that BMC expected more than twenty percent growth, both top and bottom line. On July 5, 2000, as discussed, they disclosed far worse results.

Plaintiffs argue that Defendants are liable for analysts' reports even when they do not adopt them. *Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir.1997) ("corporate defendants may be directly liable for [intentionally] providing false or misleading information to third-party securities analysts" and using them "to disseminate false information to the investing public") [48]; *In re Cirrus Logic Sec. Litig.,* 946 F.Supp.

fact or are worded as guarantees"); *Raab,* 4 F.3d 286, 289–90 (4th Cir.1993)(same) In *In re Burlington Coat Factory,* the Third Circuit concluded that "as a general matter, ... statements of comfort with or ... adoption or ratification of an analyst's projections may be actionable where the statements are sufficiently specific and accompanied by evidence suggesting that the defendants knew or should have known that the statement was false or misleading, i.e., evidence of scienter." 114 F.3d at 1429. In *Schaffer v. Timberland,* cited above, the court found a comfort statement to be actionable but admonished, "Of course, for defendants to be liable for their adoption or ratification of actionable statements, the plaintiffs ... must prove that the statements were, in fact, adopted. The case law reveals that, given the variety of expressions used in business, many of which are idiomatic or peculiar to a given industry or profession, there is no bright line to distinguish those statements which constitute adoption or ratification and those which do not." 924 F.Supp. at 1315. Even where courts

have found such statements actionable, they have treated them as forward-looking statements and required plaintiffs to plead and to show the statement was false or misleading when made, i.e., scienter. *In re HealthCare Compare Corp. Sec. Litig,* 75 F.3d 276, 280 (7th Cir.1996)(finding complaint failed to allege facts showing that comfort statements were made without any reasonable basis); *Thornton v. Micrografx,* 878 F.Supp. 931, 935 (N.D.Tex.1995)("Plaintiffs have failed to provide any facts to show that the [comfort] statement was fraudulent when made."); *In re Browning–Ferris Industries Inc. Sec. Litig.,* 876 F.Supp. 870, 895 (S.D.Tex.1995)(even if such statements are material and actionable, plaintiffs must demonstrate scienter to mislead the market).

**48.** The Court notes that this is a pre-PSLRA case. *Pegasus Holdings v. Veterinary Ctrs. of America,* 38 F.Supp.2d 1158, 1165–66 (C.D.Cal.1998)(rejecting plaintiffs' argument that non-speakers may be liable if they participated in a fraudulent scheme).

1446, 1467 (N.D.Cal.1996) ("A company may not lie to securities analysts and avoid liability for its misrepresentations by refusing to adopt the analyst reports incorporating the misrepresentations."). They charge that here Defendants, not the analysts, misled the market. Because the Court has already indicated its conclusions about such liability based on the majority view, it is not persuaded by Plaintiffs' arguments. Moreover, even if the Court were to allow such a claim, Plaintiffs are still required to plead scienter on the part of those Defendants who allegedly made such misrepresentations to analysts to manipulate them and their reports to function as conduits to mislead investors.

Plaintiffs also insist that neither the safe harbor provision of the PSLRA, 15 U.S.C. § 78u–5(c)(1)(B), nor the bespeaks caution doctrine apply here to protect any forward-looking statements because the amended complaint alleges that Defendants' statements were knowingly false and because any cautionary statements were mere boilerplate. Statutory safe harbor and bespeaks caution doctrine also do not protect misrepresentations about "historical/hard or current facts." *Gross v. Medaphis Corp.*, 977 F.Supp. 1463, 1473 (N.D.Ga.1997), *citing Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1213 & nn. 23 & 24 (1st Cir.1996). Plaintiffs claim that many of the challenged statements concern current or historical fact. They further emphasize that the safe harbor provision does not protect statements that Defendants knew were false or misleading. *Rubinstein*, 20 F.3d at 166. Moreover cautionary language regarding a prediction does not excuse a misrepresentation where the speaker knows of material adverse facts and fails to reveal them. *Id.* at 168; *In re Advanta*, 180 F.3d at 536 ("the safe harbor will not apply if the statement was made with 'actual knowledge' that the statement was false or misleading").

Finally, because the PSLRA's safe harbor provision applies only to forward-looking statements that are (1) accompanied by (2) meaningful cautionary language (3) relating directly to the subject of the forward-looking statement, 15 U.S.C. § 78u–5(c)(1), such generic language as "there can be no assurance," "subject to interpretation or change" or "subject to the risks inherent" are not specific enough to warrant dismissal of their amended complaint, insist Plaintiffs. They maintain that Defendants' boilerplate "warnings" lack substantive language tailored directly to the subject matter of any of the alleged forward-looking statements.

Furthermore, Plaintiffs argue that Defendants did not particularly identify the statements as "forward-looking" at the time they were made. None of their oral statements were so identified and distinguished from non-forward-looking statements. The insertion of a blanket disclaimer in a conference call or document that it may contain certain forward-looking statements is not sufficient. Defendants' written statements also lack meaningful cautionary language, but merely identical boilerplate repeated again and again. Such repeated boilerplate language is also insufficient to invoke the bespeaks caution doctrine. *Gray v. First Winthrop Corp.*, 82 F.3d 877, 884 (9th Cir.1996), as amended on rehearing *en banc* (June 21, 1996); *Powers v. Eichen*, 977 F.Supp. 1031 (S.D.Cal.1997)(because bespeaks caution doctrine requires analyzing statements in context, "whether a statement in a public document is misleading may be determined as a matter of law only when reasonable minds could not disagree as to whether the mix of information in the document is misleading. Inclusion of some cautionary language is not enough to support a determination as a matter of law

that defendants' statements were not misleading. . . .").

In written documents, the document at issue must identify the statement as forward-looking and the statement must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(I). In contrast, with oral statements Defendants may refer to written documents containing meaningful factors, but each particular oral statement must be identified as forward-looking and the cautionary language must warn that actual results might differ materially from those projected in the forward-looking statement. 15 U.S.C. § 78u-5(c)(2). Plaintiffs emphasize that the statement at the beginning of the conference calls says nothing more than that forward-looking statements may be included at some point in an extended discussion. Therefore the statutory requirement of identifying each particular oral statement is not satisfied. 15 U.S.C. § 78u-5(c)(2)(B)(I)-(ii).

Moreover, written forward-looking statements must be accompanied by meaningful cautionary language; they may not refer to other written documents to invoke protection. 15 U.S.C. § 78u-5(c)(1)(A)(I). Here Defendants improperly incorporate by reference in their written press releases warnings from BMC's "quarterly reports on Form 10Q and in its Annual Report to Stockholders on Form 10-K for the fiscal year ended March 31, 1999 and other filings with the SEC." Exs. A-17, A-20, A-22, A-25, A-28. While incorporation of other documents is permissible for oral statements under the PSLRA, it is not permissible for written statements. Compare 28 U.S.C. § 23(E)(c)(1)(A) with 28 U.S.C. § 23(E)(c)(2)(B).

Plaintiffs insist that they have adequately pled scienter by pleading facts and circumstances of Defendants' misconduct, with specific times, and based on reasonable inferences. The amended complaint alleges that all Defendants had access to corporate data and other non-public information about BMC by virtue of the executive positions with the company and that this information was contrary to their favorable, self-serving public representations, summarized above, about strong sales of existing software products and mainframe MIPS software and lack of customer deferrals because of Y2K concerns. Rule 9(b) may be satisfied by identifying contemporaneous statements or conditions that render Defendants' statements false or misleading when made. *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994) (defendant's assurance that house "was in perfect shape" shown to be false by fact that house was built on a landfill). Facts critical to a business' core operations or an important transaction generally are so apparent that they may be attributed to the company and its key officers. *In re PeopleSoft, Inc. Sec. Litig.,* [2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) par. 91,035, at 94,807-08, 2000 WL 1737936 (N.D.Cal.2000); *Novak,* 216 F.3d at 308; *In re Southern Pac. Funding Corp. Sec. Litig.,* 83 F.Supp.2d 1172, 1177 (D.Or.1999); *In re Ancor Communications, Inc. Sec. Litig.,* 22 F.Supp.2d 999, 1005 (D.Minn.1998). *See also Cohen,* 25 F.3d at 1171, 1174 (fact that defendants "were officers, directors, and majority shareholders of the [company and] were hands-on managers active in [its] day-to-day operations" and therefore "were fully familiar with all aspects of [its] business and financial conditions and operations" satisfied scienter because defendants probably knew their representations were false). Plaintiffs analogize by arguing that BMC's mainframe/MIPS software sys-

tems, seamless sales force, and sales execution plan were the "very essence of BMC's business plan and the key to its operations and future prospects." Memorandum at 54–55. Their detailed factual allegations raise a strong inference of scienter showing Defendants knew that many of their representations were false.

Furthermore, argue Plaintiffs, temporal proximity between Defendants' false or misleading statements and their disclosures of bad news supports a strong inference of scienter. *Shaw*, 82 F.3d at 1224, 1225 (about one month); *Fecht*, 70 F.3d at 1083 (three months); *Grand Casinos*, 988 F.Supp. 1273 (seven months). On April 25, 2000, the amended complaint states, BMC surprised the market with a positive fourth quarter earnings statement and an upbeat conference call with analysts with positive predictions for the next quarter and the remaining fiscal year, glowing statements about BMC's "spectacular rebound." They repeated their rosy statements before institutional investors on June 18, 2000. But two weeks later, on July 5, 2000, they disclosed preliminary 1stQF00 earnings far below expectations and blamed bleak earnings or a short fall in mainframe license revenues, the same area of BMC's business that two months earlier Austin claimed as "very strong" and "very profitable." Further negative disclosures followed. Thus circumstantial evidence demonstrates that the optimistic statements were false when made, Plaintiffs maintain. *Fecht*, 70 F.3d at 1083 (three weeks between optimistic statements and bad news); *Shaw*, 82 F.3d at 1224–25 (three weeks).[49]

Plaintiffs point to a similar pattern the previous year. On July 29, 1999 Defen-

49. In their Reply (# 83, at 30–34) in opposition, Defendants note that numerous authorities have rejected the proposition that a short time period between upbeat predictions and declining business, standing alone, give rise to an inference of scienter. *See, e.g., Yourish v. California Amplifier*, 191 F.3d 983, 997 (9th Cir.1999); *In re Republic Servs., Inc. Sec. Litig.*, 134 F.Supp.2d 1355, 1360–61 (S.D.Fla. 2000). This Court has cited a number for the same proposition in the course of this Memorandum and Order.

Defendants note that those cases used as authority by Plaintiffs to support temporal proximity as circumstantial evidence of scienter apply that rule only where insider trading following misstatements is clearly pled. Here however Plaintiffs fail to allege appropriate facts. Defendants did not sell any shares after the alleged comfort statements were made in December 1999 and June 2000 and before actual quarterly earnings were released. Thus they have not suggested any motive for the alleged misrepresentations, since Defendants realized no gain from the alleged fraud, and thus the proximity argument fails to give rise to a strong inference of scienter.

Moreover Defendants insist Plaintiff's temporal proximity arguments are exaggerated and not even supported by their amended complaint. Although the argue that in a statement of "comfort with analysts' estimated" "defendants confirmed" earnings estimates for the 1stQ FY01 just eleven days before the end of the quarter in June 2000 (Plaintiffs' Response at 35), the amended complaint actually says that analyst Melissa Eisenstadt was herself comfortable with her own earnings estimate for the quarter, not that any Defendant expressed comfort with her estimate. Consolidated Amended Complaint at ¶ 51. While Plaintiffs cite ¶¶ 32 and 33 for their contention that "defendants told the investing public that BMC was ahead of expectations for the quarter" in December 1999, just a few weeks before the January 5 adverse announcement, those paragraphs relate to analyst reports, not statements by Defendants. The statement by Watson on November 23 that he was comfortable with earnings estimates was issued at least six weeks before the January 5, 2000 adverse announcement. In *Kurtzman*, sl. op. at 131, this Court previously held that a period of one month between alleged misstatements and disclosures, standing alone, was insufficient to allege scienter.

Finally Defendants note that none of Defendants' alleged misrepresentations was in temporal proximity to negative developments.

dants reported much better than expected 2ndQF00 results, a strong demand for its mainframe MIPS software, successful integration of Boole & Babbage and New Dimension, and forecasted EPS growth. It again described very positive expectations on October 29, 1999. But on January 5, 2000, BMC revealed its 3rdQF00 results would be far worse than earlier forecasts because of serious problems with its sales force, failure to close several large transactions, absence of large mainframe software deals, customer refusals to purchase because of Y2K concerns, and serious weaknesses in its European operations, all of which it had described in glowing terms only months earlier. Such allegations of suspicious timing support by circumstantial evidence a strong inference that Defendants knew earlier of BMC's problems, but nevertheless issued false and misleading statements.

Finally, regarding allegations of insider trading to plead scienter, Plaintiffs insist that the timing and amount of such trading by Defendants were suspicious and therefore "presumptively probative of bad faith and scienter." *Rubinstein,* 20 F.3d at 169. They contend that the question of whether Defendants' sales were unusual is an issue for the trier of fact that is inappropriate for resolution at the pleading stage before full discovery. In *Rubinstein,* the Fifth Circuit found that stock proceeds of $760,599 for seven defendants were sufficient to allege scienter; here Defendants collectively sold 1,364,215 shares of BMC stock for proceeds of over $75.4 million.

Moreover, Plaintiffs emphasize that they have pled more than the amount of insider trading to demonstrate scienter. They have alleged sales at suspicious times, right after announcements of better than expected earnings and continuing strong product demand, successful integration of acquisitions, and rosy prospects. The fact that Defendants did not sell all of their stock and therefore are not liable merely raises a fact issue inappropriate for determination on a motion to dismiss without full discovery of the circumstances surrounding the sales and stock retentions. Defendants have also argued that the Class Period sales were not out of line with Defendants' previous sales. Plaintiffs assert that such contentions rest on information not properly before the Court and argue that the Class Period sales of Klausmeyer, Solcher, and Van Duyn were clearly out of line with their previous activity. Furthermore, even though Austin, Weiss, Wilson and Morris had no trading history, the circumstances and what they knew when they sold them, as determined through discovery, might well demonstrate scienter.

Defendants have contended that there is no inference of scienter because Plaintiffs retained exercisable options. Plaintiffs observe that the holder of vested stock options does not lose any invested money if the price declines; at worst, he suffers only a reduced expectancy of profit in the future. Retention of stock also does not preclude an inference of scienter. *Dolgow v. Anderson,* 438 F.2d 825, 828 (2d Cir.1970)(defendants' exercise of options to purchase and retain more stock than they sold does not preclude an inference of scienter); *San Leandro,* 75 F.3d 801.

As for Defendants' contention that Defendants who made no misstatements cannot be liable under § 10(b), Plaintiffs argue that they can rely on a presumption that the challenged statements are the collective work of the company's officers and directors. *GlenFed,* 60 F.3d at 593.[50]

---

**50.** Under the traditional "group pleading presumption," a company's statements "in prospectuses, registration statements, annual reports, press releases, or other group-pub-

Furthermore, Plaintiffs urge that because " § 10(b) and Rule 10b–5 are violated when a corporate insider trades . . . on the basis of material, nonpublic information. Trading on such information qualifies as a 'deceptive device' under § 10(b) . . . ." *O'Hagan*, 521 U.S. at 651–52, 117 S.Ct. 2199. Plaintiffs insist therefore that all Defendants, whether or not they issued false and misleading statements, are liable for trading on inside information and thereby participating in a fraudulent scheme.

Because Plaintiffs have stated an underlying, primary violation under § 10(b) by alleging that Watson by virtue of his executive and Board positions at BMC was a

lished information" may be presumed to be the collective work of those individuals with direct involvement in the everyday business of the company. *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999). Thus if the group pleading doctrine applies, the plaintiff is relieved of his Rule 9(b) and/or PSLRA burden of attributing statements to a particular defendant with scienter, but the plaintiff must still plead both the circumstances of the alleged misleading statements and of the falsity with particularity. *Splash*, 2000 WL 1727377, *25. No Circuit court has addressed the question of whether the doctrine survived the enactment of the PSLRA with its particularity in pleading requirements.

The district courts that have considered the question are of divergent views. Courts concluding that the group pleading presumption is no longer viable after the passage of the PSLRA include *Coates v. Heartland Wireless Communications, Inc.*, 26 F.Supp.2d 910, 916 (N.D.Tex.1998)(since PSLRA requires plaintiffs to set forth facts raising a strong inference that each defendant acted with the required state of mind, group pleading is inconsistent with 15 U.S.C. § 78u–4(b)(2), as well as contrary to its underlying policy of protecting defendants from unwarranted claims and strike suits); *Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1350 (S.D.Cal. 1998)(the "judicial presumption" of group pleading could not "be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each act or omission by the defendant"); *Marra v. Tel–Save Holdings, Inc.*, 1999 WL 317103, *5 (E.D.Pa.1999)("the presumption inherent in group pleading is inconsistent with the PSLRA's purpose . . . since the PSLRA specifically requires that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind' "; also PSLRA now "allows plaintiffs to plead upon 'information and belief' that a statement is misleading provided that the Complaint states with particularity all facts on which this belief is formed"). Holding that the group pleading doctrine survived the PSLRA are *inter alia In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999)("the PSLRA has not altered the group pleading doctrine"); *In re Miller Industries, Inc. Sec. Litig.*, 12 F.Supp.2d 1323, 1329 (N.D.Ga. 1998); *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1108 (D.Nev.1998); *In re BankAmerica Corp. Sec. Litig.*, 78 F.Supp.2d 976, 988 (E.D.Mo.1999)(group pleading doctrine "has nothing to do with scienter," is "a rebuttable presumption applicable only to a limited group of persons within the company [officers and directors with inside knowledge of and involvement in the day-to-day affairs of the company]," and "is not inconsistent with the PSLRA"); *Baan Co. Sec. Litig.*, 103 F.Supp.2d 1, 17 (D.D.C.2000). Somewhere in between is *McNamara v. Bre–X Minerals Ltd.*, 57 F.Supp.2d 396, 427 (E.D.Tex.1999)("Plaintiffs have relied too heavily on the group pleading presumption. More particularization is required . . . . Plaintiffs should, when possible, avoid attributing actions to . . . Defendants collectively. When not possible the Plaintiffs should offer an explanation as to why this is the case."). Because this Court believes a more stringent pleading is required by the PSLRA, it agrees with those district courts that find the group pleading doctrine is at odds with the PSLRA and has not survived the amendments.

This Court has so held in three previous PSLRA securities fraud, *In re Landry's Seafood Restaurant Inc. Sec. Litig.*, H–99–1948, *Collmer v. U.S. Liquids*, H–99–2785, and *Kurtzman v. Compag Computer Corp.*, H–99–779, which have been made part of the record of this case and which both sides have cited and quoted during this litigation.

914

controlling person and exercised his power and influence to cause BMC to engage in the conduct complained of, Plaintiffs maintain, they have also stated a claim for a secondary violation under § 20(a) for controlling person liability.

**Defendants' Reply (# 83)**

Noting that the majority of cases cited by Plaintiffs relate to pre-PSLRA pleading standards, Defendants reiterate that Plaintiffs have failed to satisfy the basic PSLRA requirements of particularity, factual basis for their allegations, and strong inference of scienter and rely on alleged misstatements that are not actionable as a matter of law. Reiterating the arguments made in their motion, they urge the Court to dismiss the complaint with prejudice.

■ Contending that the case is meritless, Defendants observe that although the Class Period is nearly a year long, Plaintiffs have failed to allege any misrepresentations in SEC filings or annual reports, nor have they asserted any accounting irregularities in any financial statements. Instead they targeted almost entirely alleged oral statements by two Defendants in purported conversations with analysts, which they do not quote but summarize or paraphrase. Defendants note that courts have found such generic paraphrasing as violative of the PSLRA's requirement that fraud be pled with particularity as to what was said and who said it. *In re Splash Technology Holdings Inc. Sec. Litig.*, No. C 99–00109, Fed. Sec. L. Rep. ¶ 91,250 at *18, 2000 WL 1727377 (N.D.Cal. Sept. 29, 2000)(paraphrasing of alleged fraudulent statements does not satisfy pleading burden under PSLRA); *Wenger*, 2 F.Supp.2d at 1246 (generic paraphrasing of alleged oral misstatements during road shows and conference calls lacked specificity required under Rule 9(b)). Where a minority of courts have allowed paraphrasing in complaints, the complaints have been more specific or the defendants' statements were incapable of being quoted. *See In re SmarTalk Teleservs. Inc. Sec. Litig.*, 124 F.Supp.2d 527, 543–44 (S.D.Ohio 2000)(finding paraphrased statements of speaking defendants had sufficient detail of the substance of the alleged statement and put Defendants on notice of what statements are allegedly misleading to survive motion to dismiss).[51] Defendants further claim, "Because class actions premised on such oral statements are highly

---

**51.** This Court notes that there is a split of opinion on the question. Some courts will not even accept quotations in analysts' reports. *See In re Newbridge Networks Sec. Litig.*, 926 F.Supp. 1163, 1171 (D.D.C.1996)(plaintiff must allege defendants had some control over final version of the article because the speaker might be quoted incorrectly or out of context); *In re Gupta Corp. Sec. Litig.*, 900 F.Supp. 1217, 1237 (N.D.Cal.1994)(same); *In re Splash Technology Holdings, Inc. Sec. Litig.*, No. C 99–00109 SBA, 2000 WL 1727377, *18 (N.D.Cal. Sept. 29, 2000)(neither (1) submitting a reprinted passage or a paraphrased passage from an analyst's report or a paraphrased summary of an analyst's report with boiler plate language stating that the report was written after the analyst had extensive discussions with the defendant and the report was based on repeated information provided by the defendant, or (2) paraphrasing statements made at road shows or other analyst meetings, is sufficient under the PSLRA pleading burden)' *In re Baan Co. Securities Litig.*, 103 F.Supp.2d 1, 13 (D.D.C.2000)(discussing but not deciding question). Others allow paraphrasing with some restrictions. *Seville Indus. Mach. v. Southmost Mach.*, 742 F.2d 786, 791 (3d Cir. 1984)(list containing allegations describing nature and subject of statements found to be sufficient where precise words used were not alleged).

Because Plaintiffs have not demonstrated through any alleged facts the accuracy of their reports, this Court finds that the extensive paraphrasing in Plaintiffs' amended complaint is a significant factor in this action that diminishes the strength of Plaintiffs' claim that they have met their pleading burden.

suspect, rigorous specificity is required at the outset to test the *bona fides* of such allegations." Reply at 2.

Although Plaintiffs assert that Defendants were aware of numerous internal problems with BMC's business, these allegations are "entirely conclusory" and they have impermissibly pled by hindsight after reading post-mortem reports about the company's problems. Reply at 3. They allege no particular facts to support such conclusory allegations as that the sales force integration was not succeeding, that customers informed BMC they would not purchase its products, that inexperienced salespeople caused BMC to make fewer big-ticket sales. Nor have they shown by alleged facts that Defendants were aware of BMC's troubles for the entire Class Period year. Defendants point out that this Court has previously rejected the group pleading doctrine in *Landry's, U.S. Liquids,* and *Compaq,* as the Court has indicated earlier.[52] Moreover, they point out that Plaintiffs only raised the group pleading doctrine for the first time in their response, and "it is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." *In re Baker Hughes Sec. Litig.,* 136 F.Supp.2d 630, 646–47 (S.D.Tex.2001). In addition, Defendants note that the doctrine would not apply here because it does not apply to oral statements nor to written statements attributable to a single identified Defendant, but only to statements attributable to all Defendants. *Elliott Assocs., L.P. v. Covance, Inc.,* No. 00 Cov. 4115 SAS, Fed. Sec. L. Rep. (CCH) par. 91,269, 2000 WL 1752848, *12 (S.D.N.Y. Nov. 28, 2000)("To allow group pleading in the context of oral statements would unduly expand its ambit beyond that contemplated by the Second Circuit when it adopted the theory."). *In accord, In re Interactive Network, Inc. Sec. Litig.,* 948 F.Supp. 917, 920 (N.D.Cal.1996); *Pegasus Holdings v. Veterinary Ctrs. of Am.,* 38 F.Supp.2d 1158, 1165–66 (C.D.Cal.1998)("written or oral statements made by an identified Defendant cannot be classified as 'group published' information").

Defendants insist that Plaintiffs have made no attempt to explain why each statement they target is false or misleading or to connect each statement to what the speaking Defendant knew at the time and how he knew it.

Nor have Plaintiffs specifically alleged how the individual nonspeaking Defendants have participated in the alleged scheme to defraud or how they could have controlled misstatements by other named Defendants, Watson and Austin, who were their superiors at BMC. *Compaq,* sl. op. at 126; *Pegasus,* 38 F.Supp.2d at 1164, 1166 (rejecting claims against non-speaking defendants where plaintiffs failed "to address how the non-speaking individuals were involved in the scheme, and the acts each performed (or omitted) which further the conspiracy").

The amended complaint does not show how the non-speaking Defendants "had knowledge of the fraud" sufficient to give rise to a strong inference of scienter, or allege what information they knew, or when and how they learned it. It generally attributes to them knowledge of the

---

**52.** Defendants cite the following recent cases that agree with this Court that the group pleading doctrine is inconsistent with the PSLRA: *Dartley v. ErgoBilt Inc.,* No. CIV. A. 3:98CV1442M, 2001 WL 313964 at *2 (N.D.Tex. Mar.29, 2001); *Southland Sec. Corp. v. Inspire Solutions, Inc.,* No. 4:00–CV–3554, sl. op., *6 (N.D.Tex. Mar. 12, 2001); and *In re Premiere Techs., Inc.,* No. 1:98–CV–1804–JOF, 2000 WL 33231639, *10 (N.D.Ga. Dec. 8, 2000).

alleged fraud to their high positions in BMC and their day-to-day involvement in the business or from unidentified internal corporate documents and conversations. Defendants correctly state that this Court has previously rejected just such vague pleading as insufficient to give rise to a strong inference of scienter under the PSLRA.

Defendants point out that Plaintiffs have alleged securities fraud based on false and misleading misrepresentations. Yet Plaintiffs argue that Defendants participated in a scheme to defraud through insider trading, but they have failed to plead such a cause of action. To state a claim for securities fraud based on insider trading in a private cause of action under § 10(b) and Rule 10b–5 and § 20A of the Exchange Act, a plaintiff must show that a defendant (1) used material, nonpublic information, (2) knew or recklessly disregarded that the information was material and nonpublic, and (3) traded contemporaneously with the defendant. *Neubronner v. Milken,* 6 F.3d 666, 669–70 (9th Cir.1993); *Copland v. Grumet,* 88 F.Supp.2d 326, 337–38 (D.N.J. 1999).[53] There are no specific allegations of contemporaneous trading of Plaintiffs/investors and Defendants here, with alleged facts to support such a contention. Plaintiffs have thus failed to allege suffi-

cient facts against the individual Defendants to support such a claim.

Defendants also contend that Plaintiffs' generalized allegation of insider trading fails to satisfy the PSLRA's heightened pleading requirements. There is no specific allegation of what nonpublic information was used by Defendants to trade and how they knew such information was material or nonpublic, other than the unacceptable assertion that they knew by virtue of their positions and day-to-day business activities.

After a very thorough review of the record and the applicable law, this Court agrees with Defendants, for reasons expressed by them and by this Court, frequently in footnotes throughout this Memorandum and Order, that Plaintiffs have failed to satisfy their pleading burden under the PSLRA. Defendants have meticulously shown through arguments, cited authority, and extensive exhibits that the vague and conclusory Consolidated Amended Complaint is insufficient to state a claim for securities fraud under § 10(b) and Rule 10b–5, and therefore as a matter of law, for secondary control liability against Watson and BMC under § 20(a). The great majority of targeted, allegedly false and misleading statements by Defen-

---

**53.** Section 20A of the Exchange Act provides a private right of action:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C. § 78t–1(a). *See also Neubronner,* 6 F.3d at 669. The requirement of contempo-

raneity comes "from a recognition that '[s]ince identifying the party in actual privity with the insider is virtually impossible in transactions occurring on an anonymous public market, the contemporaneous standard was developed as a more feasible avenue by which to sue insiders.' " *In re MicroStrategy, Inc.,* 115 F.Supp.2d 620, 662 & n. 8 (E.D.Va. 2000). Only such individuals "who stand to be exploited by the insider trading—for example by personally trading with the insider or, in the context of the federal law, by trading on the same market with the insider—can be said to have individual interests that are directly implicated by the insider trading for which they may seek direct redress." *Id.*

dants are paraphrases or summaries by third-party analysts, with no facts pled to indicate their accuracy or Defendants' involvement or control in their preparation. Moreover, Defendants have shown that a substantial portion of the forward-looking statements were protected under safe harbor by accompanying meaningful cautionary language in public disclosures of risk that were clear, specific, and on point with the problems that actually materialized at BMC. Where statements are not protected by safe harbor, the Court fully agrees with Defendants that Plaintiffs have failed to allege specific facts relating to each statement to demonstrate that it was misleading and to each Defendant-speaker sufficient to give rise to a strong inference that the speaker knew his statement was false when it was made. Plaintiffs have also failed to provide the necessary specific allegations to support their lists of "concealed facts" purportedly known to Defendants when they made misleading statements. Plaintiffs have relied on concepts that have not survived the enactment of the PSLRA, like the group pleading doctrine, pleading by hindsight, or pleading scienter by motive and opportunity alone, which this Court rejects.

Because this Court fully agrees with Defendants' arguments and for the additional reasons it has stated throughout this memorandum and order, especially in the footnote, the Court concludes that the motion to dismiss should be granted.

Moreover, because this Court's conclusions regarding most of the legal issues raised here were previously expressed in a number of opinions which have been made part of the record in this case and which both parties have cited and quoted, and because Plaintiffs have not requested an opportunity to replead if the Court finds the pleading of their amended complaint insufficient, the Court dismisses the amended complaint with prejudice.

Accordingly, for the reasons stated above, the Court ORDERS the following:

(1) Plaintiffs' motion to strike is DENIED; and

(2) Defendants' motion to dismiss the amended complaint with prejudice pursuant to Fed. Rules of Civ. P. 12(b)(6) and 9(b) and the PSLRA. Final Judgment will issue by separate instrument.